## JOSEPH DIENER, Appellant, v. STAR-CHRON-ICLE PUBLISHING COMPANY.

### In Banc, February 9, 1911.

1. **PETITION: Demurrer Preserved for Review.** Where a demurrer to the petition has been sustained it does not need a bill of exceptions to preserve it for review on appeal.

2. ————: ————: **Judgment at Subsequent Term: Appeal.** A demurrer to the petition may be sustained at one term, and final judgment reserved to the next; and if at said next or a succeeding term final judgment is entered, plaintiff's appeal taken in proper time at that term, is timely.

3. ————: **Combined Demurrer and Motion.** A paper which is both a general demurrer and a motion to strike out the petition, cannot be approved.

4. ————: **Motion to Strike Out.** A demurrer to the petition may be preserved for review without a bill of exceptions; but a motion to strike out the amended petition on the ground that it is but a repetition of one which has already been held bad on demurrer, should be preserved for review in a bill of exceptions.

5. ————: **Combined Demurrer and Motion.** Where defendant filed a motion to strike plaintiff's second amended petition from the files, in which is combined both a general demurrer and a motion to strike out, and the motion is sustained on the ground that the petition is but a repetition of a former one which it

had been held did not state a cause of action, and that ruling is followed by a final judgment, the paper on appeal will be treated as a demurrer, and the only question considered will be whether or not the second amended petition states a cause of action.

*Held*, by WOODSON, J., in separate opinion, that where the amended petition is but a *replica* of the original petition held bad on demurrer, it should be stricken from the files; but sustaining the motion to strike out does not deprive plaintiff of his right to an appeal.

6. **LIBEL: Kill: Libelous Per Se.** The words "killing" and "killer" are not fairly susceptible of being construed to mean the unlawful or criminal taking of human life, and of themselves are not libelous *per se*. When read with their context, which relates to the killing of a child on the street by an automobile collision, and are unconnected with vituperation and calumny, they do not mean that the chauffeur wantonly and willfully took the child's life.

*Held*, by WOODSON, J., dissenting, that when read in connection with other words found in the newspaper article, referring to plaintiff as a man "who had wantonly taken the life of an innocent child in direct violation of law," and with the further charge that plaintiff was "responsible for a criminal offense for which he might be sent to the penitentiary," they constitute libel *per se*.

7. ———:. **Wantonly Taking Life: Hypothesis.** The phrase "a man who had wantonly taken the life of an innocent child in direct violation of the law," standing alone and used as a charge, is libelous; but when the context shows it was used argumentatively and by way of hypothesis, it is not libelous.
   *Held*, by WOODSON, J., dissenting, that the words were not used hypothetically, but as a direct charge, and could refer only to plaintiff, and are libelous *per se*.

8. ———: **Penitentiary Offense: Argumentative.** The use of the expression, "Further, such a finding would make the chauffeur responsible for a criminal offense for which he might be sent to the penitentiary for life and from the consequences of which he might easily have freed himself while he was at liberty," used in the criticism of the coroner's inquest of the chauffeur's running down the child with his automobile, and not as a statement of fact, and evidently not meant to charge that the chauffeur had actually committed a felony, does not make the publication libelous as against the chauffeur.

*Held*, by WOODSON, J., dissenting, that these words are libelous *per se*, and refer directly to plaintiff.

9. ———: Public Hatred, etc.: No Defamation. A publication having a tendency to expose one to "public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse" merely, and no more, is not libelous. The controlling words in the statute in which those are used are "malicious defamation," and defamation includes the idea of calumny, aspersion by lying, etc.

*Held*, by WOODSON, J., dissenting, that when the article referred to plaintiff as a man "who had wantonly taken the life of an innocent child in direct violation of law," as the "killer," "who did the killing," and as "responsible for a criminal offense for which he might be sent to the penitentiary for life," the "malicious defamation" was present, and the article, by reason thereof, did tend "to expose him to public hatred, contempt or ridicule," and "to deprive him of the benefits of public confidence and social intercourse."

Appeal from St. Louis City Circuit Court.—*Hon. Chas. Claflin Allen*, Judge.

AFFIRMED.

*Robert & Robert* for appellant.

(1) The circuit court had no authority to strike the second amended petition from the files. But one petition had been adjudged insufficient upon demurrer. R. S. 1899, secs. 596, 601, 621-623; Comstock v. Davis, 51 Mo. 569; Spurlock v. Railroad, 93 Mo. 13; Barton v. Martin, 54 Mo. App. 134; Antonelli v. Basile, 93 Mo. App. 141. (2) Where words complained of as libelous are susceptible of two meanings, one harmless and the other defamatory, the jury must determine in which sense the readers may have understood them. Constitution of Mo., art. 2, sec. 14; Julian v. Star Co., 209 Mo. 35; McGinnis v. Knapp, 109 Mo. 131; Caruth v. Richardson, 96 Mo. 190; Johnson v. Dispatch Co., 2 Mo. App. 569; Feder v. Herrick, 43 N. J. L. 24; Publishing Co. v. Jones, 83 Tex. 302; Odgers, Libel and Slander, secs. 23, 306. (3) Both petitions stated a cause of action for libel *per se*, as the publica-

tion charged the plaintiff with the commission of a crime and held him up to public scorn. R. S. 1899, secs. 1815, 1816, 1817, 1835, 2259, 2375; Meriwether v. Knapp, 224 Mo. 617; Julian v. Star Co., 209 Mo. 35; Minteer v. Bradstreet, 174 Mo. 485; Noeninger v. Vogt, 88 Mo. 589; Ferguson v. Pub. Co., 72 Mo. App. 462; Hermann v. Bradstreet, 19 Mo. App. 229; Pub. Co. v. Smith, 149 Fed. 704; O'Shaughnessy v. Recorder Co., 58 Fed. 653; Holt v. State, 89 Ga. 316; Poole v. State, 87 Ga. 526; Clark, Crim. Law (2 Ed.), 186; 1 Whart., Crim. Law; 329. (4) The charge that the plaintiff "had wantonly taken the life of an innocent child, in direct violation of the law," is libelous *per se*. The use of the word "wantonly" imputes a crime to the plaintiff. Trauerman v. Lippincott, 35 Mo. App. 478; State v. Schoenwald, 37 Mo. 147; State v. Weeden, 133 Mo. 70; N. C. v. Vanderpool, 35 Fed. 282; State v. Massey, 97 N. C. 465; Branch v. State, 41 Tex. 622. (5) The words, "in direct violation of the law," certainly charge a crime. No charge could be more direct. Harper v. Ins. Co., 18 Mo. 109, 19 Mo. 506; Overton v. Ins. Co., 39 Mo. 122; Wolff v. Ins. Co., 5 Mo. App. 236; Brown v. K. P., 83 Mo. App. 633; Murray v. Ins. Co., 96 N. Y. 614; People v. Fox, 38 N. Y. Supp. 635; Cluff v. Ins. Co., 95 Mass. 308; Bloom v. Ins. Co., 97 Ind. 478. (6) (a) The words "killing" and "killer" imputed to the plaintiff the crime of murder and are actionable *per se*. Jones v. Murray, 167 Mo. 25; Noeninger v. Vogt, 88 Mo. 589; Button v. Heyward, 8 Mod. 24; Cooper v. Smith, 1 Rolle's Abr. 77; Doan v. Kelley, 121 Ind. 413; O'Connor v. O'Connor, 24 Ind. 218; Thomas v. Blasdel, 147 Mass. 438; McLaughlin v. Cowley, 131 Mass. 70; McLaughlin v. Cowley, 127 Mass. 316; Publishing Co. v. Jones, 83 Tex. 302; Curley v. Feeney, 67 N. J. L. 70; Carroll v. White, 33 Barb. 615; Hays v. Hays, 1 Humph. 402; Cady v. Times Co., 58 Minn. 329; Palmer v. Smith, 21 Minn. 419; "Killer,"

Webster's Dictionary, and Century Dictionary.   (b) The defendant itself put this construction on the words by suggesting in the same article that the plaintiff's act might make him responsible for a criminal offense for which he might be sent to the penitentiary for life, and that could be only for murder, or manslaughter in the first degree.   (7)   It was only necessary to allege in the petition, ''generally,'' that the words were ''published or spoken concerning the plaintiff.''   R. S. 1899, sec. 635; Julian v. Star Co., 209 Mo. 35; Callahan v. Ingram, 122 Mo. 366; Caruth v. Richeson, 96 Mo. 186; Curry v. Collins, 37 Mo. 324; Hudson v. Garner, 22 Mo. 423; Steiber v. Wensel, 19 Mo. 513; Boyce v. Aubuchon, 34 Mo. App. 315; State v. Pulitzer, 12 Mo. App. 9; Doan v. Kelley, 121 Ind. 413; Curley v. Feeney, 62 N. J. L. 70.

*Nathan Frank* and *Richard A. Jones* for respondent.

The article declared on is not libelous.   It does not make a defamatory charge against appellant, does not attribute to him any delinquency, legal or moral, and the trial court rightfully held that as to him no statement was contained in the matter complained of which constitutes a cause of action.   Spurlock v. Investment Co., 59 Mo. App. 225; Baldwin v. Walser, 41 Mo. App. 243; Legg v. Dunleavy, 80 Mo. 558; Branch v. Knapp, 222 Mo. 580; Blackwell v. Smith, 8 Mo. App. 43; Cristal v. Craig, 80 Mo. 367; Salvatille v. Ghio, 9 Mo. App. 155; Wood v. Hilbish, 23 Mo.   App. 389; Klos   v. Zahorik, 113 Ia. 61; Barr v. Pub. Co., 27 R. I. 101; Curry v. Collins, 37 Mo. 324; Brown v. Tribune, 77 N. Y. Supp. 461; Foot v. Pitt, 82 N. Y. Supp. 464; Ramscar v. Gerry, 1 N. Y. Supp. 635; Kilgore v. Evening Star, 96 Md. 16; Hollenbeck v. Hall, 103 Ia. 214; Homer v. Engelhardt, 117 Mass. 539; Hanaw v. Jackson Patriot Co., 98 Mich. 506; Edwards v. Chandler, 14 Mich.

471; Bearce v. Bass, 88 Me. 521; Dunneback v. Tribune Ptg. Co., 108 Mich. 75; Brown v. Boynton, 122 Mich. 251.

LAMM, J.—Tort for libel. This is a companion case to one between the same parties, officially reported in 230 Missouri Report at page 613, involving another libel. Plaintiff's original petition was held bad on general demurrer. He plead over. At a subsequent term he voluntarily withdrew his first amended petition and filed a second, reading (*Nota bene,* the part in italics and brackets being in addition to the averments of the original petition, otherwise they were the same):

"Now comes Joseph Diener, plaintiff in the above entitled cause, and files this his second amended petition, and for cause of action states that the defendant, Star-Chronicle Publishing Company, was and is at all times hereinafter mentioned a corporation duly organized and existing under the laws of the State of Missouri. That at the time hereinafter mentioned said defendant was the publisher, proprietor and printer of a certain daily newspaper of large circulation in and about the city of St. Louis, which said newspaper is published in the city of St. Louis, State of Missouri, and is known as the '*St. Louis Star-Chronicle.*'

"That on, to-wit, the 5th day of May, 1906, there was printed and published in said newspaper the following false, defamatory and libelous article or language of and concerning the plaintiff, to-wit:

" 'The Coroner's investigation into the death of little Gertrude Copeland, who was torn to pieces by Health Comr. Bond's automobile, held the dead child guilty of contributory negligence, and in this way released the chauffeur from legal responsibility, as far as a Coroner's inquest can.

" 'What chance on earth was there that it should have done anything else?

" 'Coroner Baron had already decided that Chauffeur Diener was in no way responsible for the killing by ordering the police to turn him out free on the night of his arrest, without a charge or a bond to hold him.

" 'The Coroner took this action on the pledge of the Health Commissioner that he was sure the chauffeur was in no way to blame for the awful death.

" 'The police acted on the written order of the Coroner.

" 'To hold Chauffeur Diener directly responsible for the killing now would be to hold the police department, the Health Commissioner and the Coroner responsible for the atrocious act of setting at liberty a man who had wantonly taken the life of an innocent child in direct violation of the law.

" 'Further, such a finding would make the chauffeur responsible for a criminal offense, for which he might be sent to the penitentiary for life, and from the consequence of which he could easily have fled while he was at liberty.

" 'If the Coroner had brought about such a finish to the investigation he would have been a rare man, indeed.

" 'Investigation of the high-handed handling of the case reveals that on the night of the tragedy the police released the chauffeur from all responsibility on the authority of Coroner Baron; that the Coroner acted on the information of Health Commissioner Bond, and the Health Commissioner got all his information entirely from the chauffeur, who rushed home to tell his boss that he had run over a child, but was not to blame.

" 'Thus, on the single and unsupported statement

of Chauffeur Diener who did the killing, the killer was released.

" 'To save the faces of the officials involved, the child just had to be guilty of contributory negligence.

" 'The Chauffeur told the Health Commissioner, the Health Commissioner told the Coroner, and the Coroner told the police, but the pretty little innocent child told nobody, because she died almost instantly.'

"Thereby meaning to charge this plaintiff with having committed a *crime involving moral turpitude, and with having willfully and wantonly taken the life of a human being.*

"*That at all times referred to in said publication the plaintiff was the chauffeur of Health Commissioner Bond, which fact the defendant well knew, and that this plaintiff was the chauffeur and the person to whom the defendant referred in said publication.*

"Plaintiff further states that said publication was willful and malicious, and that he has been damaged thereby in the sum of twenty-five thousand dollars.

"Wherefore, plaintiff prays judgment in the sum of twenty-five thousand dollars and his costs."

Defendant attacked the amended petition with the following motion:

"Comes defendant, Star-Chronicle Publishing Company, and moves the court that the second amended petition of the plaintiff in the above entitled cause be stricken from the files and for naught held for the following reasons:

"The matters and things stated and charged in said pleadings are not sufficient to constitute a cause of action against the defendant.

"The subject-matter contained and charged therein is in substance the same as that contained in the original petition, to which pleading the court heretofore sustained a demurrer for the reason that such

matter was not sufficient to constitute a cause of action against the defendant; and by his so-called second amended petition the plaintiff seeks simply a review of a decision of this court which has long since become final.''

On hearing of that motion the court made the following order:

''The court having duly considered the motion to strike the second amended petition from the files heretofore filed and submitted herein, doth order that said motion be and the same is hereby sustained, because this court has previously sustained a demurrer to the original petition stating the same cause of action.''

On a day following that entry, judgment went for the defendant, narrating, *inter alia,* that a demurrer to the original petition was sustained, that later a motion to strike the second amended petition from the files was sustained, because the court had previously sustained a demurrer to the original petition stating the same cause of action; and that plaintiff thereupon declines to plead further, wherefore, final judgment is entered that plaintiff take nothing and defendant go hence without day, etc.

In due time plaintiff filed his motion for new trial, saved an exception to overruling the same, and by a bill of exceptions undertook to preserve his exception to the ruling on the demurrer to the original petition at a prior term, his exceptions to the rulings of the court sustaining defendant's motion to strike out plaintiff's second amended petition, and to preserve the original petition for review here.

Thereafter, perfecting his appeal, the cause came up for review on assignments of error, viz: (1) In sustaining the demurrer to the original petition; (2) In striking the amended petition from the files.

I. It is an accredited legal maxim that, Novelty benefits not so much by its utility, as it disturbs by its novelty. There is another that, We are never to recur to what is extraordinary, until what is ordinary fails. The wisdom of both is finely illustrated by this record. Plaintiff, refusing to stand on his original petition, on demurrer being sustained, files first and second amended petitions, and now asks us to tread back and review the action of the court at a former term in allowing the demurrer to the original. If a bill of exceptions were necessary to preserve a demurrer, the ruling thereon and a formal exception thereto, then there is nothing before us on that assignment. This, since a bill of exceptions was filed at a subsequent term, and the general rule is that unless leave be timely granted to file a bill (a condition not presented by this record), the exceptions at each term must be preserved by a bill at that term—they die with the term unless kept alive with a bill. But a bill of exceptions is not a *sine qua non* to save a demurrer. It needs no "such adventitious aid."

In that view of it, the next question is whether the matter was not waived by filing an amended petition? Are not the old petition, the old demurrer and the old ruling, one and all, *functus officio?* Now, if plaintiff had filed no amended petition, but at a subsequent term had announced he would stand on his original petition and if final judgment had then gone, the question would be simple and its answer at hand. In that event, as there can be but one final judgment in a case and as the code does not require it to be entered at the same term a demurrer is sustained, and as no bill of exceptions was necessary, it would seem the original petition, demurrer and the ruling thereon would be here for review according to accepted canons of practice. But the hypothesis just indulged does not aid us in the presence of the facts; for they

do not run that way in this record. To add to the confusion, counsel for the defendant did not, in terms and technically, *demur* to the second amended petition. They filed a *motion* to strike it from the files, but in doing so their pleading was dual in form. It sought to kill two birds with one stone, or, rather, one with two. It was not only a motion to strike out but also a general demurrer. If that practice is to be tolerated we will presently see,. by one stroke of a pen, an answer, a demurrer, a motion to strike from the files or to dismiss as a bundle, an aggregation leading up to judicial puzzle-headedness. But this is not all the confusion. In the case at bar plaintiff raised no objections to the dual features of the "motion." Furthermore, the court (strictly speaking)· apparently ignored the ground of the motion directed to the sufficiency of the amended petition, and sustained it on the grounds the amended petition was a *replica* of an original already held bad on demurrer. This, agreeable to the idea that once dead always dead, *ergo,* once dead was enough. In that rather narrow view of it, the bill of exceptions was necessary to preserve the motion to strike from the files in so far as it filled the office of such motion; for the general rule is *motions* can be preserved nowhere else.

In this condition of the record, plaintiff's. counsel argue there is .no such motion known to the practice, as one to strike a petition from the files.

*Contra,* defendant argues that the motion was well enough, for that plaintiff was not entitled to two rulings, *nisi,* on the sufficiency of the same petition. We shall not pursue the matter. It seems a tempest in a teapot. We have dwelt on the foregoing novel features, raising singular questions of practice, not to decide them at this time, but to edify and admonish. I am not so sure that the brace of lines originally leveled at changes in fashion, maybe:

"Be not the first by whom the new are tried,
Nor yet the last to lay the old aside,"
is not a good court rule.

Our conclusion on the matter is that, in legal effect, the ruling on the motion to strike from the files was equivalent to sustaining the demurrer to the second amended petition. It certainly reached that end —witness the final judgment hard on the heels of that ruling. Apparently such was the office given it by the parties and the court. True, the language of the order sustaining the motion and that of the judgment itself might bear another construction. It might mean that the court paid no attention to the ground in the motion in the nature of a demurrer. But it is susceptible of the construction we put upon it. It may be held to mean that, as the court had already sustained another demurrer to what it deemed the same petition, it stood by its guns, was satisfied with its legal conclusions and, to make them now effective, applied them to the motion and the amended petition. Certain it is that defendant cannot complain of this view. It voluntarily injected the demurrer into the body of its motion and must stand sponsor for its presence in the record. Nor can plaintiff complain, since the view just taken is the most favorable possible to him. It is immaterial then, whether we consider the original or the last demurrer, nor need we bother with comparing the petitions to see if they are the same; for, if they are, the question is here on the last demurrer. If they are not, then the sufficiency of the last petition presents the single question in the case. We prefer to let the appeal ride off on its own merits, rather than on odd questions of practice.

Observe, plaintiff's petition did not differentiate between actual damages and smart money as provided by Revised Statutes 1899, section 994. Under such circumstances he was entitled to no punitive damages.

However he complains of malice in the publication, his pleading was unmistakable notice to the defendant that no exemplary damages were claimed on that score. This omission does not make the petition demurrable, but is it not to be taken as something of an estimate by learned counsel on the gravity of the libel? Is it not to be reckoned with from that viewpoint? We pass the matter without deciding it, and need not allow it as a controlling element of the case. This brings us to the main question: Was the petition good?

(a) Some of the words said to be poisoned with a libelous sting are "killing" and "killer." In the companion case, supra, the word was "killed" and we concluded that, interpreted in the light of the context, it was not ambiguous and was not fairly susceptible of being construed to mean the unlawful or criminal taking of human life. We follow that ruling on the words "killing" and "killer." The natural import of "to kill" is to deprive of life, and of "killer" is one that kills. The opinion in the other case must be taken with this on those words (*quod vide.*) They are not libelous *per se* unless the context gives them a libelous twist or color, and the context in the article we are considering does not do that here any more than the other article did there. Libel cannot hang on so slender a thread as a mere matter of taste in the penman's selection of one word instead of another one, interchangeable as a synonym or (by condensation) in using laconically one word instead of expanding and diluting his idea into a phrase, thereby toning and softening it down. The use of a given word often make the stroke that of a feather. The use of another may make the stroke that of a hammer. When the purpose is honest, as gathered from the whole publication, when the discussion is on a matter of live and public concern (as here), and there are no earmarks of malice through invectives, vituperation

or calumny, and where the publication does not pertain to the private business and the private character of the individual, or charge corruption, or other misdemeanor to one clothed with authority in a defamatory way—we say, when such condition of things appears, then a writer may use a hammer instead of a feather in fulminating argumentatively.

(b) The main contention of the counsel is that the phrase, "wantonly taken the life of an innocent child in direct violation of law," imputes a crime—therefore, it is libelous *per se*. But that phrase is only part of a sentence, and to bear the libelous construction put upon it by the plaintiff's innuendo, it must be wrenched from its context. Standing alone as a statement of existing fact, we would agree with learned counsel that the words charged a crime and were actionable *per se*. The trouble is the words do not stand alone. The context shows that they were used argumentatively and by way of hypothesis. Now, it goes without saying that an hypothesis is not equivalent to a statement of fact. The context shows that there is no such charge made against plaintiff by direct statement or by logical inference or by roundabout insinuation as will presently appear.

In leading up to a just conclusion, we must take a bird's-eye view of the whole article. Obviously, it is aimed at Dr. Baron and his official conduct (as coroner as well as the conduct of a coroner's jury) and that of other officials. It undertakes to discuss that conduct in relation to the death of a child on the street through a collision with an automobile. We do not rule that A may not libel B in criticising C; A may strike B over C's shoulder. But, as ruled in the former case, so we rule now, the malice supporting an action of libel must flow from defendant to plaintiff and not to another. So that, for the libel, if any, to Baron or the other officials, he or they must sue. This plaintiff

can recover nothing on that score unless he goes further and shows he, himself, was libeled.

It seems shortly before the fifth day of May, 1906, a little girl, Gertrude Copeland was killed on a street in St. Louis by an automobile driven by plaintiff as chauffeur. The automobile was that of the Health Commissioner of the city of St. Louis. It seems the chauffeur reported to his employer, the Health Commissioner, and the latter took the matter up with Doctor Baron as Coroner. We infer the chauffeur was then in the custody of the police.

The Health Commissioner, on the strength of the representation of his servant, took the servant's view of it, viz., that he was not to blame for the death of the child. The Coroner, after consulting with the Health Commissioner, took the Health Commissioner's view of it and gave a written order for the release of the chauffeur or an order resulting in his release from custody. With this condition of things the writer of the article was not in accord. Finally, a coroner's inquest was held and its finding was to the effect that the chauffeur was not to blame. It is common knowledge that while an investigation by a coroner is judicial in its character, yet the coroner does not stand precisely in the attitude of a judge to a jury in a court of justice. To the contrary, he takes part in the investigation and verdict, commonly participates in the jury's deliberations, and the verdict not infrequently takes color from his predilections and conclusions. In this view of the matter the writer of the article chose to criticise the coroner for having prejudged the cause of the death of the little girl before inquest held, and for having officially meddled in procuring the release of the chauffeur from the custody of the police on an *ex parte* showing by the chauffeur alone and without an impartial investigation of the facts. The article goes on to throw doubt upon the value of

the verdict of the coroner's jury. In doing so the writer of it argues that the jury could do no less than to find the chauffeur without blame, because to find he was to blame was equivalent to condemning what had already been done by the police department, the health commissioner and the coroner. A verdict against the chauffeur, he argued, was not to be expected since such verdict would be to convict the coroner et al. of an atrocious act. What atrocious act? "The atrocious act of setting at liberty a man who had wantonly (not in fact, but as the jury had just found in that hypothesis) taken the life of an innocent child in direct violation of law." That is to say, if the jury had rendered a verdict to the effect that the child came to its death at the hands of the driver of the automobile, through his wanton (that is, his reckless) conduct, then by the same token the coroner was guilty of the atrocious act of setting such a man free.

We make nothing more out of the words than an illustration by way of hypothesis used *arguendo,* to show that the coroner's verdict had no significance, and was produced by evil precedent conditions. To make a statement of fact out of the hypothesis of the writer would be a most unfair, forced and unnatural construction. A demurrer reaches the vice of such a construction. [Diener v. Star-Chronicle Pub. Co., supra.]

The writer goes on to argue, in effect, that under the circumstances outlined the coroner's inquest was mere mummery "to save the faces" of the officials in a matter of sharp concern to the public, which matter they had already and improperly prejudged and determined.

In this condition of things, we can very well see how the coroner's jury or the officials might grieve over the accusation. But, as said, the question of

libel or no libel as to them is not here. In the defendant's statement of its case against the officials, the transaction in which they are said to be derelict had to be described. To do so necessarily involved the mention of the chauffeur directly or by implication. He was mentioned. His connection with the child's death was set forth and, broadly speaking, the alleged libel is no more than a public denunciation of those officials for putting themselves in a situation seemingly precluding a fair and searching coroner's quest into the cause of the child's violent death.

(c)     There is other language criticised as either libelous, or as feathering the libelous arrow in the phrase just considered under paragraph b, viz.: ''Further, such a finding would make the chauffeur responsible for a criminal offense for which he might be sent to the penitentiary for life and from the consequence of which he could easily have freed himself while he was at liberty.''  Stress is laid on the words ''criminal offense,'' the words ''penitentiary for life'' and the idea of the chauffeur fleeing; but, taking the whole paragraph with what goes before and after, a reasonable reader could not construe it as a statement of fact, or that the chauffeur had actually committed a criminal offense for which the law might consign him to the penitentiary for life, or that he was likely to take leg-bail for it. The paragraph in hand was but part of the hypothesis discussed by the author of the screed, tending to throw cold water on the verdict. It was based on what would be the effect of a coroner's verdict condemning the chauffeur, and was but leading up to the conclusion that no such verdict was a possibility after the coroner had taken a position in favor of the chauffeur, as his conduct indicated— conduct characterized as ''the high-handed handling of the case.''  The paragraph is followed by another leaving no doubt of the writer's meaning, viz.: ''If

the coroner had brought about such a finish to the investigation, he would have been a rare man indeed." The context, instead of aiding plaintiff's innuendo, entirely explodes it.

(d) Finally, it is argued that the tendency of the publication was to expose plaintiff to "public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, etc." [R. S. 1899, sec 2259.] But he who thinks that an article merely having that tendency is either a civil or a criminal libel has studied the law of libel to little purpose. The controlling words in that section are "malicious defamation" by means of printing and writing, etc., tending to provoke him to wrath or expose him, etc. There must be *defamation* in a libelous sense before there can be a libel. Otherwise, alarming results would follow. For instance: in a community believing in beer and wine drinking a good devotee of total abstinence would be libeled by a mere expose of his true principles, thereby necessarily holding him up to public scorn, contempt, etc., among his bibulous neighbors. To make a libel there must be defamation in the sense of the law before the public scorn and contempt feature is operative. Defamation includes the idea of calumny, aspersion by lying—the injury of another's reputation in that way. To defame is to speak evil of one maliciously, to dishonor, to render infamous. Whether the words of the publication could reasonably bear such interpretation was a question of law. [Diener v. Star-Chronicle Pub. Co., 230 Mo. 613; Donaghue v. Gaffy, 54 Conn. 257; Heller v. Pulitzer Pub. Co., 153 Mo. 205; Urban v. Helmick, 15 Wash. 155; Ukman v. Daily Record, 189 Mo. l. c. 390; Branch v. Knapp and Co., 222 Mo. l. c. 587-8.] We think it was well decided.

232 Sup.—28

(e)    The doctrine of the right of free speech and free press discussed in the other case applies as well to this and leads to the same conclusion.

The premises all considered, the judgment was right. Let it be affirmed.

The foregoing opinion was written in Division One by *Lamm, J.* The case came into Banc on the dissent of a judge of that Division. On reargument in Banc, the divisional opinion of *Lamm, J.,* became the opinion of the court. Accordingly, the judgment is affirmed.

*Graves, Ferriss* and *Brown, JJ.,* concur. *Woodson* and *Kennish, JJ.,* dissent, *Woodson, J.,* in an opinion filed; *Valliant, C. J.,* absent.


## DISSENTING OPINION.

WOODSON, J.—This is a suit brought by the plaintiff against the defendant to recover $25,000 damages, sustained by him in consequence of the publication, by the latter, of the alleged libelous article set out in the petition.

A demurrer to the petition was filed and sustained, and by leave of court an amended petition was filed by plaintiff. The defendant filed a motion to strike this petition from the files, for the reason that the amended petition was but a *replica* of the original, which had been held bad on the first demurrer filed. Said motion also contained a general demurrer. This motion and demurrer were by the court sustained; and the plaintiff declining to plead further, judgment was duly rendered against him and in favor of the defendant. From that judgment the plaintiff duly appealed to this court.

The amended petition, which the court adjudged bad, reads as follows:

"Now comes Joseph Diener, plaintiff in the above entitled cause, and files this his second petition, and for cause of action states that the defendant, Star-Chronicle Publishing Company, was and is at all times hereinafter mentioned a corporation duly organized and existing under the laws of the State of Missouri. That at the time hereinafter mentioned said defendant was the publisher, proprietor and printer of a certain daily newspaper of large circulation in and about the city of St. Louis, which said newspaper is published in the city of St. Louis, State of Missouri, and is known as the '*St Louis Star-Chronicle.*'

"That on, to-wit, the 5th day of May, 1906, there was printed and published in said newspaper the following false, defamatory and libelous article or language of and concerning the plaintiff, to-wit:

The Coroner's investigation into the death of little Gertrude Copeland, who was TORN TO PIECES by Health Commissioner Bond's automobile, held the dead child guilty of **AND THE** contributory negligence, and in this way released **CHILD SAID** the chauffeur from legal responsibility, as far as **NOTHING.** a Coroner's quest can. What chance on earth was there that it should have done anything else?

Coroner Baron had already decided that Chauffeur Diener WAS IN NO WAY RESPONSIBLE for the killing by ordering the police to turn him out free on the night of the arrest, without a charge or a bond to hold him.

The Coroner took this action on the pledge of the Health Commissioner that he was sure the chauffeur was in no way to blame for the awful death.

The police acted on the written order of the Coroner.

To hold Chauffeur Diener directly responsible for the killing now would be to hold the police department, the Health Commissioner and the Coroner responsible for the atrocious act of setting at liberty a man who had WANTONLY TAKEN THE LIFE OF AN INNOCENT CHILD, in direct violation of the law.

Further, such a finding would make the chauffeur responsible for a criminal offense for which he might be sent to the penitentiary for life, and from the consequences of which he could easily have fled while he was at liberty.

If the Coroner had brought about such a finish to the investi-gation, he would have been a rare man, indeed.

Investigation of the high-handed handling of the case reveals that on the night of the tragedy the police released the chauffeur from all responsibility on the authority of Coroner Baron; that the Coroner acted on the information of Health Commissioner Bond, and that Health Commissioner Bond got all his information entirely from the chauffeur, who rushed home to tell his boss that he had run over a child, but was not to blame.

Thus, on the single and unsupported statement of Chauffeur Diener, who did the killing, the killer was released.

To "SAVE THE FACES" of the officials involved, the child had to be guilty of "CONTRIBUTORY NEGLIGENCE."

The chauffeur told the Health Commissioner and the Health Commissioner told the Coroner, and the Coroner told the police— but the pretty little innocent child told nobody, because she "DIED ALMOST INSTANTLY."

"[Thereby meaning to charge this plaintiff with having committed a crime involving moral turpitude, and with having willfully and wantonly taken the life of a human being.

"That at all times referred to in said publication the plaintiff was the chauffeur of Health Commissioner Bond, which fact the defendant well knew, and that this plaintiff was the chauffeur and the person to whom the defendant referred in said publication.]

"Plaintiff further states that said publication was willful and malicious, and that he has been damaged thereby in the sum of twenty-five thousand dollars.

"Wherefore, plaintiff prays judgment in the sum of twenty-five thousand dollars and his costs."

The only difference between the original and amended petition is, the former contained no innuendo or colloquium, while the latter does, which is embraced in brackets, as above appears.

The errors assigned by counsel for appellant are as follows:

"1. The court erred in sustaining the demurrer to the original petition.

"2.   The court erred in striking the second amended petition from the files.

"3.   The court erred in entering judgment for the defendant.

"4.   The court erred in overruling plaintiff's motion for a new trial."

I.   The first proposition presented for determination by counsel for appellant arraigns the action of the circuit court in striking out his amended petition.

If the amended petition was in fact but a *replica* of the original, then the trial court properly struck it from the files, as was held by this court in the case of Scott v. Taylor, 231 Mo. 654.   To the same effect are the following cases:   Savings Association v. Clause, 13 Wyo. 166; McKee v. Railroad, 121 Iowa 550; Enright v. Midland Sampling & Ore Co., 33 Colo. 341; Hoyt v. Beach, 104 Iowa 257.

In this connection counsel for respondent contend that after the court sustained the motion to strike the amended petition from the files, and granted appellant leave to file a second amended petition, and he having declined to do so, the court properly entered judgment for the respondent.

This contention is predicated upon the further contention that, the original petition having been adjudged bad, the only thing remaining for appellant to do was to stand on the demurrer or file an amended petition, and not a duplicate of the original; but instead of doing that, he filed a *replica,* which, when stricken out, left nothing for the court to do except to enter final judgment against him; and that he has no right of appeal, because the petition was adjudged bad under the first demurrer, which was unappealed from, and which could not be appealed from at the subsequent term, the term at which the motion to strike out was sustained; consequently, the only thing

the court could properly do was to enter final judgment for the defendant, which was done.

Some of the cases before cited support that contention of counsel, but that is not the practice in this State. Here, when the demurrer to the original petition was sustained, the appellant could either have stood upon the demurrer and let judgment go against him and appealed therefrom, or he could have availed himself of the right (as he did here) to file an amended petition; and, having chosen the latter course, there was no final judgment rendered upon the demurrer to the original petition from which an appeal could have been taken; and the mere fact that he may have filed a duplicate of the original instead of an amended petition could not have changed the character of the order actually entered on the demurrer to the original petition into such a judgment as would prevent the circuit court from passing upon the so-called amended petition, whether it was a duplicate of the original or not. The only purpose of filing a motion to strike out the amended petition where it is in fact a duplicate of the original which has been held insufficient, is to take a short cut on the plaintiff, and thereby prevent dilatory practice and pleas by having the duplicate stricken out and final judgment entered thereon, without waiting for the plaintiff to file and the court to pass upon the same petition two or three times, which would have to be done if a demurrer should be filed to each. Where the motion to strike out is sustained because the amended petition is simply a duplicate of the original, no necessity exists for the court to make an order allowing plaintiff to file a second amended petition, for the reason he has thereby abandoned his right to file a second under sections 621, 622 and 623, Revised Statutes 1899. [Scott v. Taylor, supra.]

Since taking that view of the case, which we think is the correct one, it becomes unnecessary for us to

pass upon the question as to whether the amended petition is a *replica* of the original or not.

II.   This brings us to the consideration of the main proposition presented by this record, namely: does the amended petition filed in the cause state facts sufficient to constitute a cause of action, or, in other words, does the language charged in the petition to have been published of and concerning the appellant constitute a libelous charge? Counsel for appellant contend that it does, while those for respondent deny it.

Both the demurrer to the petition and the motion to strike the amended petition from the files not only admit the publication of the article complained of but also all legitimate inferences which may be reasonably drawn therefrom.   Upon that state of the case the only thing the court has to do is to determine whether or not the construction placed upon the article by counsel for appellant can be reasonably drawn therefrom.

In order to determine that question we should bear in mind the definition of a libel as stated in section 2259, Revised Statutes 1899: "A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse or any malicious defamation made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends."

Since it is admitted that the article complained of was published of and concerning the appellant, we will, in the light of the foregoing definition of libel, try and determine whether or not said article "tended to provoke appellant to wrath or expose him to public

hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse.''

Counsel for appellant point us to the following language contained in said article which they contend tends to expose the appellant to public hatred and contempt, and to deprive him of the benefits of public confidence and social intercourse, to-wit, that the appellant is ''a man who had wantonly taken the life of an innocent child in direct violation of the law.''

We can conceive of no language which could be published of and concerning a man which would more strongly expose him to public hatred and contempt, or to deprive him of the benefits of public confidence and social intercourse than those here published, namely, that he had wantonly, recklessly, heedlessly or maliciously taken the life of an innocent little girl, in direct violation of law. This is the plain and ordinary meaning to be given those words; and in order to determine whether or not they would tend to expose appellant to public hatred and contempt, or to deprive him of the benefits of public confidence and social intercourse, one need but ask himself the question, what he and all right thinking people would think of a man who would wantonly or maliciously take the life of a little innocent girl? Inevitably the anwer must be that he not only richly deserved public hatred and contempt and should be deprived of the benefits of public confidence and social intercourse, but also that he should be severely punished therefor by imprisonment in the penitentiary, if not hung on the gallows. No self-respecting person could have any confidence or respect for such a man.

Counsel for respondent endeavor to place a different or modified construction from what we have upon the language before quoted from said article by contending that the entire paragraph should be read and construed together.

Let us see about that—the entire paragraph reads as follows: "To hold Chauffeur Diener directly responsible for the killing now would be to hold the Police Department, the Health Commissioner and the Coroner responsible for the atrocious act of setting at liberty a man who had *wantonly taken the life of an innocent child,* in direct violation of law."

By reading this entire paragraph, it will be seen that it makes two charges: one against the Police Department, the Health Commissioner and the Coroner, and the other against the appellant. It also appears therefrom that the charge made against the former is conditional, while that published against the latter is unconditional; and that the basic fact upon which the said conditional criticism is made, namely, to now hold Diener responsible for the killing, would be to hold the Police Department, Health Commissioner and Coroner responsible for the atrocious act of setting at liberty the appellant, is the unconditional charge made in the publication that the appellant "had wantonly taken the life of an innocent child, in direct violation of the law." Or, in other words, the charge made against the Police Department, Health Commissioner and Coroner is conditional in character, but that published of and concerning the appellant is unconditional, in that it charges him with "wantonly taking the life of an innocent child, in direct violation of the law."

There would be no sense or meaning in the charge made against the Police Department, Health Commissioner and Coroner if Diener, the appellant who was discharged by them, was an innocent man; but in order to make the charge lodged against those officers effective, the respondent had to assume and charge that appellant was a criminal and should be severely punished therefor.

The construction we have placed upon the paragraph before mentioned is strengthened and made clearer by another paragraph contained in the same article, which is as follows: "Thus on the single and unsupported statement of Chauffeur Diener, who did the killing, the killer was released." By reading this language in connection with the previous paragraph, we can see no escape from the conclusion that the writer of the article in question intended thereby to charge Diener with a criminal offense, namely, that of wantonly or maliciously killing an innocent child, "for which [in the language of the article] he might be sent to the penitentiary for life."

There are scores of authorities which hold that such language published of and concerning a person is libelous *per se*. [R. S. 1899, secs. 1815, 1816, 1817, 1835, 2375; Julian v. Star Publishing Co., 209 Mo. 35; Minter v. Bradstreet, 174 Mo. 485; Noeninger v. Vogt, 88 Mo. 589; Ferguson v. Chronicle Pub. Co., 72 Mo. App. 462; Hermann v. Bradstreet, 19 Mo. App. 227; Commercial Pub. Co. v. Smith, 149 Fed. 704; O'Shaughnessy v. Record Co., 58 Fed. 653; Meriwether v. Knapp, 224 Mo. 617.]

Not only does the entire article, when read as a whole, constitute a libel against appellant, as previously defined, but there are two or more paragraphs contained in the article which separately constitute libelous charges against the appellant, if they are not true in point of fact. For instance, the charge that appellant "had wantonly taken the life of an innocent child, in direct violation of the law," is libelous, for the reason that the word "wanton" means reckless; heedless; malicious. [Webster's New International Dictionary.]

And malice means, in a legal sense (the sense in which the article in question used it), a wrongful act intentionally done without just cause or excuse.

[State v. Schoenwald, 31 Mo. 147; State v. Weeden, 133 Mo. 70; North Carolina v. Vanderford, 35 Fed. 282; State v. Massey, 97 N. C. 465; Branch v. State, 41 Tex. 622; Trauerman v. Lippincott, 39 Mo. App. 478.]

According to these authorities, the language last quoted accused the appellant of wantonly or maliciously killing Gertrude Copeland; and if that accusation is true, then he is guilty of a crime for which he is punishable by imprisonment in the penitentiary. [See statutes before cited.] This was also true at common law. But if that charge is not true, it is libelous *per se*. [Noeninger v. Vogt, 88 Mo. 589. Also see cases before cited.]

The following paragraph contained in said article is also libelous *per se*, viz.: "Thus on the single and unsupported statement of Chauffeur Diener, who did the killing, the killer was released."

The authorities are uniform in holding that language to be libelous. [Button v. Heyward, 8 Mod. 24; Jones v. Murray, 167 Mo. 25, l. c. 30; Noeninger v. Vogt, supra; Cooper v. Smith, 1 Rolle's Abridgment; Doan v. Kelley, 121 Ind. 413; Thomas v. Blasdale, 147 Mass. 438; McLaughlin v. Cowley, 131 Mass. 70; Publishing Co. v. Jones, 83 Tex. 302; Carroll v. White, 33 Barb. 615; Hays v. Hays, 1 Humph. 402; Cady v. Times Co., 58 Minn. 329.]

Evidently, the respondent placed the same construction upon the article that we have. That fact is manifested by the statement that appellant's act of killing might make him responsible for a criminal offense for which he might be sent to the penitentiary for life. Under the laws of this State a person cannot be sent to the penitentiary for killing a human being without the act was either murder or manslaughter. So, evidently, as before stated, the writer of the article thought and intended thereby to charge

appellant with some criminal offense punishable by imprisonment in the penitentiary.

So it is seen that whether we consider this publication as an entirety or by paragraphs, it is libelous.

I am, therefore, of the opinion that the trial court erred in holding that it was not libelous in character; and for that reason the judgment should be reversed and the cause remanded for another trial.

*Kennish, J.,* concurs.