## CHARLES V. PETTY, Respondent, v. WILLIAM R. NELSON, Appellant.

### Kansas City Court of Appeals, April 7, 1913.

1. **LIBEL: Gambling on Sunday: Article Excluding Plaintiff.** Though a publication describes drinking and gambling at a Sunday picnic, in a pasture near Paola, Kansas, and states nine of the party, without giving names, had pleaded guilty to gambling and named several others as having been arrested, and then states that plaintiff and three or four others, giving their names, had not been arrested, might, disconnected from other parts of the article, be reasonably interpreted as meaning to insinuate that plaintiff had been gambling and had pleaded guilty; yet, if the balance of the articles disclosed that only nine were gambling and gave their names, plaintiff's not being one of them, there was no libel.

2. ———: **Ambiguous Language: Cunning Device: Jury.** Where the matter published is subject to two meanings or interpretations, one libelous and the other not, it is a question for the jury to say whether they were published for libelous purposes; and no cunningly devised arrangement of words will protect the publisher if the words will convey to the mind of a reader of ordinary intelligence a defamatory charge.

3. ———: ———: ———: **Entire Article: Conclusion.** In determining whether a published article is libelous, the entire publication must be considered and a conclusion reached from the whole.

170 Mo. App.—2

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield*, Judge.

REVERSED.

*Watson & Watson* for appellant.

(1) The court erred in overruling defendant's demurrer to plaintiff's petition because it does not state facts sufficient to constitute a cause of action against defendant. Diener v. Pub. Co., 230 Mo. 627; Diener v. Pub. Co., 232 Mo. 416; Tilles v. Pub. Co., 145 S. W. 1152; McClure v. Pub. Co., 38 Wash. 160, 80 Pac. 303. (2) The court erred in giving plaintiff's instruction No. 1, because it omits the element of knowledge that said publication was false; the fact that a publication of a qualifiedly privileged character is false does not make a case, but the publisher must know it is false when he makes such publication. Caulfield v. Whitworth, 18 L. T. 527, 16 W. R. 936; Newell on Slander and Libel, p. 325; Somerville v. Hawkins, 10 C. B. 583; Laughlin v. Schmitzer, 106 S. W. 908. (3) The court erred in defining malice as applied to this case. The jury should have been required to find express malice or malice in fact. Weaver v. Hendricks, 30 Mo. 505; Tilles v. Publishing Co., 145 S. W. 1152; Holmes v. Royal Fraternal Union, 222 Mo. 556. See also cases under point 2. (4) Under the pleadings and evidence the verdict and judgment should have been for defendant. There was no malice in fact shown and the jury found against punitive damages under plaintiff's instruction No. 5. There was no malice in fact found in this case, and inferentially no malice of any kind at all was found by the jury. Tilles v. Pub. Co., 145 S. W. 1152; Weaver v. Henderson, supra; Holmes v. Union, 222 Mo. supra.

*Thos. H. Kingsley* and *Martin J. O'Donnell* for respondent.

(1) The petition states a cause of action. It was for the jury to say if the words bear the construction placed upon them, the demurrer to the petition was properly overruled. Kenworthy v. Journal, 117 Mo. App. 327; McGinnis v. Geo. Knapp, 109 Mo. 131; Morris v. Sailer, 154 Mo. App. 310. (2) This is not a privileged or even qualifiedly privileged article. There is no privilege in falsehood. The answer does not plead the defense and it should not be considered. Cook v. Pulitzer Pub. Co., 241 Mo. 326; Morris v. Sailer, 154 Mo. App. 305; Brown v. Globe, 312 Mo. 611; Boogher v. Geo. Knapp Co., 97 Mo. 129; Byers v. Meridian Co., 95 N. E. (Ohio), 917; Williams Ptg. Co. v. Saunders, 73 S. E. 472. (3) If the facts published are false, the defense of privilege fails. It is not necessary to show express malice also. Cook v. Pulitzer Pub. Co., 241 Mo. 361; Byers v. Meridian Co., supra; Williams Ptg. Co. v. Saunders, supra; Newell on Slander, supra; Brown v. Globe, 213 Mo. 611. (4) But actual malice was shown in the publication of the article. Minter v. Bradstreet, 174 Mo. 496; Words & Phrases. (5) Whether the published account is fair and impartial and truthful, the meaning of the language and its effect on the reader are questions for the jury and the court properly overruled defendant's peremptory instructions. McKinnis v. Geo. Knapp Co., supra; Morris v. Sailer, supra; Julian v. Star, 209 Mo. 35; Boogher v. Geo. Knapp Co., supra; Cook v. Pulitzer Co., 241 Mo. 357; Hinke v. Griffith, 29 Kan. 516; Shaftall v. Central of Georgia, 51 S. E. (Ga.) 646.

ELLISON, J.—Defendant is proprietor of the Kansas City Star, a newspaper of large circulation,

and plaintiff, a citizen of Paola, Kansas, claiming that he was defamed through the columns of the paper, brought this action for libel and obtained judgment in the circuit court.

The publication was of a picnic in "Boone's pasture," two miles out from Paola, on Easter Sunday, the 16th of April, 1911. Plaintiff was a member of that party, and a short statement of the nature and object of the gathering and his part in it, will aid in determining whether he has been defamed by the article published. The party was composed of twenty-five or thirty men, mostly residents of Paola, and they came on the grounds in the morning. It seems to be conceded that the traffic in intoxicating liquor is forbidden in Kansas; therefore a shipment of an eight gallon keg and a case of bottled beer had been ordered from Kansas City, Missouri, and it was awaiting the claim of an owner at the depot. So plaintiff with his team and the help of another man loaded up the liquor and took it to the pasture. There they dug a hole in the ground, placed the beer within, put ice on top and covered it up till needed a little later. They then set, or rather constructed, a table with boards brought along, and spread a lunch. Shortly eating and drinking began. Plaintiff partook of both. At one part of his testimony he denied he had any lunch, then qualified the denial into not remembering, and subsequently admitted he partook of it with the others; but all the time stated he drank his "share" of the beer. Whether he was intoxicated was a question left unsettled. He said he was not and others said he was. After the lunch was over gambling began in a game called "shooting craps," in which as much as eight hundred dollars was lost and won. When that amount had changed hands, either in cash, checks or verbal promise, it was suspicioned by a lawyer who happened on the ground that the dice were loaded, in consequence of

which three of those engaged were getting about all the winnings. They were examined and found to be filled on one side with quicksilver and on the other with cotton. This incident ended the game and the party returned to town. Plaintiff did not, himself, take part in the game, though he knew it was going on. He confined his amusement to shooting at targets along a nearby creek with a rifle and five hundred cartridges he had brought out with him, and at about four o'clock in the afternoon he took up a collection for expense of the entertainment, put the proceeds on the table, and not being interested in the investigation of the dice, drove back to town. And this, which has been taken from his testimony, seems to have ended his connection with the affair, except as he may have been tacked to it by the alleged defamatory article. His demeanor as a witness was not as candid as it should have been. He tried hard to say he did not know gambling was going on; said he only had a "presentiment" it was; that he merely "felt it in the air,"—when in fact he was so near that he must have known it as well as if he had been taking part. Again, he gave as a reason why he did not report the gambling to officers of the law, that it would have "compelled him to miss his Sunday bath and shave and Sunday attendance at church."

The character of the entertainment and the extraordinary ending of it naturally became town-talk in Paola and nine of the participants, or guests as they were called, went before a magistrate after night and pleaded guilty to gambling and were fined ten dollars each. The prosecuting attorney of the county concluded that these pleas were collusive and began a prosecution against five of them for gambling.

The foregoing formed the basis for the publication of which plaintiff complains. It reads as follows:

## "LOADED DICE UPSET PAOLA.

"A Lawyer Exposed a 'Sport' and Others must be Tried.

"Charlie Boone laughed when Mercury was Taken from the Dice—His Guests Pleaded Guilty— County Attorney Charges Collusion.

"Paola, Kas., May 10.—Paola's 'Get-Rich-Quick-Wallingford' has been exposed. It all happened in Charlie Boone's pasture, a mile and a half east of town, Easter Sunday, April 16.

"Two spotted cubes, innocent looking on the out-side caused Charlie Boone's downfall as a 'sport' here. And it remained for a lawyer, Frank M. Sheri-dan, Democratic political manager of Miami County, to take the quick-silver from the educated dice.

"Easter Sunday in Paola always is observed in some way or another, so about 11 o'clock John Lucas got into his motor car and drove seven or eight of 'the boys' out to Charlie Boone's farm.

"The boys had arranged to roast a few eggs. A keg of beer preceded them, but not one of them knows how it got there. One of the players admitted that they had taken their 'twenty-two's' along to shoot at targets. But target shooting gets awful tame for blooded sports in a small town, so someone suggested that they shoot a round or two of craps. 'Who's got the bones,' one asked. And luckily,—most of them agree on this point—Charlie Boone had. It was an innocent game when it first started. But it grew. Most any kind of crap shooter can throw 'seven' and 'eleven' with regular dice, where the results are only a matter of luck. After an hour's playing, the Paola amateurs saw that three men—Boone, J. L. Fuller and T. A. Reeves, were the only players that could make their 'points' with the high school dice. But if they suspected anything they never let their suspi-cions develop into fear. All the players except Boone,

Fuller and Reeves lost all the money they had and started writing checks. A lot of them finally resorted to 'mouth bets' which means a verbal promise to pay when they got the money.

"Several hundred dollars was in the game—most of it was in Charlie Boone's possession—when Frank Sheridan drove to the farm. He knew all the boys and walked over to watch the game. One round of the dice convinced him that Boone, Fuller and Reeves knew a lot more about that particular pair of 'get-rich-quick' implements than the other six men. Mr. Sheridan's story follows: 'I saw that something made those dice roll differently from others I had seen. "Let me roll 'em," I told the boys. I shook them up well. They were heavy. I rolled them. I picked them up again. "I want to look at these a minute" I said and took them over to Lucas's motor car. I drilled a hole in one of the dice and enough mercury to charge a thermometer rolled out. I picked out quite a large piece of cotton, too. Then Charlie laughed as if it were a great joke and paid part of the money back. The game stopped.' But a good joke has to be told. It was only three or four days until word got to the sheriff about the Easter Sunday 'party.'

"Four men were called before G. B. Hanna, justice of the peace. Under threats that they would be imprisoned if they didn't tell about it they 'squealed.' Word got around to the others that they were to be arrested. Whether it was a collusion will be decided in the June term of court, but any way, nine men went to T. R. Kent, justice of the peace, at 10 o'clock one night about a week after the game, pleaded guilty to gambling and were fined $10 and costs. They paid. That process settled most troubles in small towns in Kansas, but not in Paola.

"The county attorney, E. J. Sheldon, believed he saw a chance to get some money for the county. He filed information charging L. B. Petty, T. J. Cummins,

L. J. Fuller, C. C. Boxley and T. A. Reeves with gambling. They were arrested and released on $500 bonds to await trial in the June term of the district court. The county attorney didn't file against J. Q. Smith, George Donovan, L. A. Koehler, C. V. Petty and Charles Boone. The others say he is prosecuting them for political purposes.

"Ordinarily, when a person pleads guilty and is fined in a justice court, he cannot be tried again in the district court, in Kansas, but there are two or three decisions by higher courts in Kansas which allow the county attorney to file complaints if he can prove collusion in the settlement before the justice of the peace. The Miami County attorney says he can prove collusion here. In the meantime, Paola is talking about the Easter Sunday game and the players are figuring how they can escape a $50 fine, thirty days in jail, or both.

"Most of the players are business men here. T. J. Cummins is an insurance agent; C. C. Boxley, a grocer; J. L. Fuller, a bowling alley proprietor; T. A. Reeves, janitor; J. Q. Smith, a farmer; George Donovan, a paper hanger; L. A. Koehler, runs a pantatorium; Charles Boone, a farmer and L. B. Petty is a carpenter."

It will be observed that plaintiff's name, which is C. V. Petty, is mentioned but once and that was in connection with the men who had and those who had not been arrested; it being stated that he had not been.

Plaintiff concedes there is no direct statement reflecting upon him or his conduct, and that there is no misstatement of fact in the article, but he insists it is so worded as to leave the inference that he was guilty of gambling on Sunday and had pleaded guilty to such a charge before a justice of the peace. It is the law that where the words published are subject to two meanings or interpretations, one libelous and the other not, it is for the jury to say whether they were used for libelous purposes; and that no cunningly

devised arrangement of words in a publication will protect the publisher if those words will convey to the understanding of an ordinarily intelligent reader a defamatory charge. [Morris v. Sailer, 154 Mo. App. 305.] But in determining whether an article is libelous, the entire publication must be considered, and the conclusion must be drawn from the whole. [Diener v. Chronicle Pub. Co., 230 Mo. 613, 625; Diener v. Star-Chronicle Pub. Co., 232 Mo. 416, 428, 432.]

It may be conceded the statement that the county attorney had filed an information charging several named parties with gambling; that they were arrested and released on bonds to await trial at the June term of the district court; and that "The county attorney didn't file against J. Q. Smith, George Donovan, L. A. Koehler, C. V. Petty (the plaintiff) and Charles Boone," disconnected from the balance of the article might be interpreted by the ordinarily intelligent reader as meaning that the latter persons also had been gambling, though not arrested. And it may even be conceded that connecting this part of the publication with the immediately preceding statement that nine men had pleaded guilty to gambling before a justice of the peace and were fined ten dollars, would be reasonably subject to the interpretation that Smith, Donovan, Koehler, Boone and plaintiff had pleaded guilty to gambling.

But when we look to the whole article, it is clear that no one could reasonably believe plaintiff was charged with gambling or with having pleaded guilty to that offense. The article clearly shows that it charges only nine men with gambling and pleading guilty thereto before the justice. It states that the "amateurs saw that three men—Boone, J. L. Fuller and T. A. Reeves were the only players that could make their points with the high school dice;" and that "all the players except Boone, Fuller and Reeves lost all the money they had;" and that Sheridan was con-

vinced that "Boone, Fuller and Reeves knew a lot more about that particular pair of 'get-rich-quick' implements than *the other six men.*" Here it is made to appear that only three men and six men, making nine in all, were gambling. It is then stated that "nine men" went before a justice of the peace at night and pleaded guilty and were fined. These were, of course, the nine which it had just been stated were gambling. Now, who were the nine? The article does not leave it to inference, nor give room for *innuendo* as to who they were. They are mentioned by name, each with his business, and, as stated therein, all but two farmers were business men of Paola, and plaintiff's name is not among them, though his brother's is. The language used being as follows: "Most of the players are business men here. T. J. Cummins is an insurance agent; C. C. Boxley, a grocer; J. L. Fuller, a bowling alley proprietor; T. A. Reeves, janitor; J. Q. Smith, a farmer; George Donovan, a paper hanger; L. A. Koehler, runs a pantatorium; Charles Boone, a farmer, and L. B. Petty is a carpenter."

It thus appears that the publication stated there were nine men playing—that is, gambling; that nine men pleaded guilty at night before a justice of the peace to gambling; and that these players, or gamblers, are certain named business men of Paola and two farmers. It seems clear that instead of an article including plaintiff by inference as one of the gamblers, it excludes him. To put the matter in small compass, the article states that nine men were gambling and had pleaded guilty thereto and names who they were, plaintiff not being one of them.

But plaintiff insists on an answer why his name was dragged into the article at all, if not to smirch him. It is true the mention of his name as being one of those the county attorney did not have arrested, might well have been omitted. Yet, it must be kept in mind that he was one of a Sunday carousing party,

that he took the beer and food to the grounds, that he collected expenses for the entertainment, that he partook of the meat and drink of the party, and that he was using firearms for amusement during the day. In view of the part he took, at once the most useful and most prominent in the whole affair, and the fact that much talk started up, necessarily causing misunderstanding to find lodgment in the minds of people as to the degrees of guilt of those who were present, may it not be said that the article did him valuable service in exculpating him from the stigma of being arrested when perhaps the majority of law abiding people thought he should have been.

It follows from the foregoing that the judgment should be reversed. The other judges concur.