Dave Coots, Plaintiff-Appellant, v. Bonnie Paxton and D. Wayne Rowland, d/b/a The Seymour Citizen, Defendants-Respondents, No. 44269—280 S. W. (2d) 47.

Court en Banc, June 13, 1955.

John Hosmer and John Newberry for appellant.

Haymes & Haymes, Ellsworth Haymes, Combs & Combs and J. Carroll Combs for respondents.

[49] COIL, C.—Plaintiff-appellant has appealed from a judgment which, in effect, dismissed his three count amended petition in which he sought $60,000 actual and punitive damages from defendants-respondents for alleged libel.

Respondents have moved to dismiss the appeal on the ground that the transcript was filed out of time. The notice of appeal was filed February 13, 1954, and the transcript, May 28, 1954, fourteen days beyond the expiration of 90 days from the filing of the notice of appeal. Section 512.130. (All section references are to RSMo 1949, V.A.M.S.) The transcript, as filed here, contained this entry under date of May 25, 1954: "Upon motion of plaintiff's attorney, John Hosmer, the Court this day enlarges and extends period of time for filing transcript on appeal a period of twenty days on account of failure to file within 90 day period being due to excusable neglect." Sections 506.060, 2(2) and 512.140 authorize a trial court to extend the period for filing a transcript where that court determines that the failure to have filed in time was the result of excusable neglect; subject, of course, to the provision of S.C. Rule 3.26 that the total period of the extensions granted by the trial court shall not exceed six months from the date the notice of appeal is filed in the trial court. It appears from counsels' affidavits and counteraffidavits that plaintiff's motion to extend the time for filing the transcript was not in writing and that no notice was [50] given by plaintiff to opposing counsel that the plaintiff intended to apply for the extension. It seems agreed, however, that the trial court, prior to making the order above noted, advised one of defendants' counsel that the motion had been made and that the court intended to sustain it and make the order extending the time. Defendants' counsel, then present in court, objected on the sole ground that, inasmuch as he was not the chief defense attorney in the case, he did not know whether such chief attorney would *consent* to the extension. No objection was made that

the failure of plaintiff to file the transcript within 90 days was not the result of excusable neglect. Under the circumstances, we are of the opinion that there has been no such violation, if any, of procedural steps as to call for the dismissal of this appeal. The motion to dismiss is, therefore, overruled. See: Baldwin v. Desgranges, 355 Mo. 959, 966, 199 S.W. 2d 353, 354, 355.

Plaintiff's original petition contained 4 counts. Defendants' motion to dismiss was overruled as to count 1 and sustained as to counts 2, 3, and 4. Defendants filed their separate answers to count 1. About a year later, the trial court granted plaintiff leave to file, and plaintiff filed, an amended petition. Count 1 of the amended petition was identical with count 1 of the original petition. Count 2 of the amended petition was identical with count 4 of the original petition, except that plaintiff included in count 2 of the amended petition the entire newspaper article from which the alleged defamatory matter set forth in original count 4 had been extracted. Count 3 of the amended petition combined in substantially identical form counts 2 and 3 of the original petition. The trial court sustained defendants' motion to dismiss count 1 of the amended petition and to strike counts 2 and 3, and granted plaintiff 10 days to file a motion for new trial. Plaintiff's motion for new trial was overruled and he has appealed from the judgment of the trial court, the effect of which, plaintiff contends, was to dismiss all 3 counts of his amended petition.

The briefs discuss the effect of the various rulings of the trial court. It seems to us, however, that the appeal in this case necessarily involves the sole question of whether each of the four counts of the original petition or each of the three counts of the amended petition stated claims upon which relief might be granted. Plaintiff could not appeal from the order dismissing counts 2, 3, and 4 of the original petition, because count 1 was still pending. It, therefore, is apparent that it is of no consequence whether we treat with the three counts of the original petition (which were dismissed) and count 1 of the amended petition (which was dismissed), or with all three counts of the amended petition. It would, therefore, serve no useful purpose to discuss or determine the validity of the parties' views as to the effect of the sustention of defendants' motions to strike or as to the claimed abuse of discretion by the trial court in permitting an amended petition to be filed a year after the dismissal of three counts of the original petition. We, therefore, proceed to decide whether counts 1, 2, and 3 (or any of them) of the amended petition state claims upon which relief may be granted.

All three counts are identical in these averments: that defendants are the editors and publishers of a weekly newspaper circulated and read by the general public in the City of Seymour and throughout Webster and adjoining counties; that on a certain date (specified in the various counts) "a certain article concerning the plaintiff was

printed in said newspaper containing the following false, defamatory, malicious and libelous words about and concerning the plaintiff, * * *.'' Each count, after setting forth the words allegedly published, proceeded: that the ''good name, fame and reputation'' of the plaintiff have been injured and that he has been brought into ''public reproach, ridicule, disgrace, contempt, and infamy; that he has been caused to suffer great mortification, humiliation, embarrassment and shame; * * *.'' The prayer of each count was for $10,000 actual and $10,000 punitive damages.

[51] The allegedly defamatory communications set forth in counts 1, 2, and 3, respectively, are:

Count 1. '' 'Personally I'd still like to put in a plug for having a city marshal who looked like a law enforcement officer. Put him in something that looks like a uniform even if its just matching khaki shirt and pants. Insist that his badge and belts and weapons be worn out in the open. Nobody likes to be ticketed by a guy who looks just like anybody else loafing on the curb, and who reaches way down deep in his longies under his unbuttoned overalls to drag out his horse pistol or 'black jack.' ''

Count 2. '' 'Dave Coots, Seymour's infamous ex-marshal, . . .' and that the whole of said article, including the caption or headline, but excluding the picture of the plaintiff which was also printed adjoining said article, is set out haec verba below:

'' 'MARSHALL ARRESTED BY COOTS
GOES TO MARSHFIELD JAIL

'' 'Dave Coots, Seymour's infamous ex-marshall, Tuesday morning was appointed as a special officer by John Holmquist, police judge, to arrest James Hamblin, present city marshal, on a contempt-of-court charge?' '' (It is unnecessary to here set forth the other paragraphs of the article.)

Count 3. '' 'This is not my idea, but someone told me he had a sure scheme for filling the coffers of the City of Seymour.. In view of the widespread publicity given our Marshal recently, he said, the City Council should put Dave in a cage and charge admission to tourists.' '' [And a later article]: '' 'I actually feel sorry for a man who can't take a little good natured ribbing. Last week I made a couple of cracks about Dave Coots in this column which everyone considered amusing except, of course, Dave himself. Dave's a law enforcement officer, at least the City Council seems to think he is. He ought to be well enough acquainted with the law to know that if a newspaper says something slanderous or libelous about someone, that person can sue, ——————like several other Seymourites I'm tired of being pushed around by a one-man army. It's one thing to have proper law enforcement. It's another thing to have law enforcement that's crude, belligerent, unfair, and at times, ignorant.' ''

■ Article I, § 8, Mo. Const., 1945, provides that the jury, under the direction of the court, shall determine the law and facts in suits for libel. It is well established, however, that a petition in which damages are sought for defamation by libel is subject to a motion to dismiss. Jacobs v. Transcontinental & Western Air, 358 Mo. 674, 680, 216 S.W. 2d 523, 526[6,7], and cases there cited. But the function of a trial court and of an appellate court in determining the sufficiency of a petition setting forth a claim for damages for libel is necessarily limited to a determination of whether the communication set forth in the petition, together with matters of inducement and innuendo which may be there contained, is capable of a defamatory meaning. This function may require the court to determine whether the communication reasonably conveyed the meaning ascribed to it by plaintiff and, if so, whether that meaning was defamatory in character. Restatement, Torts, Vol. 3, § 614, p. 304.

■ Preliminary to a consideration of the alleged libels set forth in the three counts of the amended petition, it would be well to here dispose of some general propositions and isolate the exact question for decision. It is not specifically averred in the amended petition that plaintiff was or had been, during the time of the various publications, the city marshal of the town of Seymour. Indeed, so far as the petition is concerned, it is alleged that the statements that plaintiff was or had been such marshal were false. Defendants contend, however, that it affirmatively appears that plaintiff was a public official and that defendants were editors and publishers of a newspaper; from which premise defendants contend that the petition discloses that the occasions of the publications were conditionally privileged. In oral argument there appeared to be no dispute that plaintiff [52] was the Seymour marshal during the time of three of the publications and that the other communication referred to plaintiff's prior status as such marshal. We shall assume, therefore, for present purposes, that the petition does disclose that plaintiff was a town marshal. Even so, the fact, if it be a fact, that the occasions of the publications may have been conditionally privileged cannot be decisive as to the sufficiency of plaintiff's petition. This, because plaintiff may recover damages by reason of false defamatory matter communicated on a conditionally privileged occasion, provided he proves abuse of the occasion. Therein, of course, lies the difference between absolute and conditional privilege. Laun v. Union Electric Co. of Missouri, 350 Mo. 572, 578[2], 584, 166 S.W. 2d 1065, 1068[2,3], 1073[15,16]. Thus, unless plaintiff's petition showed on its face that the occasions for the communications were absolutely privileged (and there is no contention that it does), or unless plaintiff's petition affirmatively averred that the occasions for the communications were not abused (and the petition does not so do), we could not, on the ground urged, hold that plaintiff had failed to state claims upon which relief

could be granted. Furthermore, there can be no question of privilege involved in publishing *false* reports (labeled facts) about anyone. And it is alleged that the communications were false. The question of privilege usually arises when the publication contains the true facts, or substantially so, but also contains untrue comments based on such true facts, or where the publication of true facts also contains untrue statements by others. Moritz v. Kansas City Star Co., 364 Mo. 32, 258 S.W. 2d. 583, 585[1-7]; Kleinschmidt v. Johnson, Mo., 183 S.W. 2d 82, 84[3, 4].

Defendants also contend generally that where alleged libelous words are contained in a newspaper article, the whole of the article must be set forth in the petition so that the court may construe the alleged libelous words in their context. It is true that the court must construe an article as a whole in determining the reasonable meaning of the words alleged to be libelous. Hylsky v. Globe Democrat Pub. Co., 348 Mo. 83, 88[1], 152 S.W. 2d 119, 121[1, 2]. The amended petition, standing alone, does not disclose that the entire articles have not been set forth in each of the counts. But even if it be assumed that the entire articles have not been set forth, it is not always necessary to do so. Lorenz v. Towntalk Pub. Co., Mo., 261 S.W. 2d 952, 954. Plaintiff has pleaded the alleged libelous words haec verba and, in considering the sufficiency of plaintiff's petition on motion to dismiss, we may not determine whether omitted portions of an article would qualify the meaning of the pleaded words. Quite another question might arise when, at a trial of the cause, plaintiff sought to introduce in evidence an entire article which changed the meaning of the extracted parts which were set forth in the petition. Such a situation would involve a question of the admissibility of evidence, i.e., whether the proof conformed to the pleading, a question with which we are not here concerned. See: Meriwether v. Knapp & Co., 211 Mo. 199, 206-210, 109 S.W. 750, 751, 752.

It should also be noted that in none of the counts has plaintiff pleaded any extrinsic circumstances which he alleges affect the defamatory meaning of the communication or its applicability to him, nor has he stated the meaning which he ascribes to the words used. In other words, plaintiff has pleaded no matters ordinarily referred to as "inducement" or "innuendo". Restatement, Torts, Vol. 3, § 563, comment f, pp. 149, 150. Plaintiff simply says that defendants published in their newspaper "about and concerning" him certain false and defamatory matter. He then quotes the exact matter published and says that the foregoing false and defamatory matter injured him. Therefore, we must reasonably construe the words themselves and determine whether they, standing alone, and without any averment as to what the words may have meant by reason of other circumstances, are reasonably capable of defamatory meaning.

[53] Section 559.410 defines a libel: "A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, * * *." This definition is applicable in both criminal and civil cases. Hylsky v. Globe Democrat Pub. Co., supra, 152 S.W. 2d 122[5, 6]. And any false, unprivileged, written communication which, reasonably construed, comes within the statutory definition is libelous per se. Seested v. Post Printing & Publishing Co., 326 Mo. 559, 575, 31 S.W. 2d 1045, 1052[4-7].

The difficulty encountered in an attempt to apply the statutory definition in a given case stems from the fact that it is not entirely clear whether the law is that an unprivileged, false, written communication is automatically a "defamation" *if* it tends to expose to "public hatred, contempt or ridicule, or to deprive * * * of the benefits of public confidence and social intercourse", or, whether the writing itself must amount to a "defamation" which, if so, is libelous if it also tends to expose to "hatred, etc." And if the latter is the correct rule, what is a "defamation" or what language is capable of a defamatory meaning? It is plaintiff's contention that the rule first stated is the law, while defendant contends to the contrary. It is true that some of the cases, in which the writers were not considering the specific question here posed, may, by implication at least, indicate that a false, written, unprivileged communication is libelous and therefore, of course "defamatory" *if* it exposes to hatred, contempt *or* ridicule. See: Moritz v. Kansas City Star Co., supra, 258 S.W. 2d 588-590; Childers v. Nesselroad, 357 Mo. 1218, 1221[1], 212 S.W. 2d 727, 728[1].

It would appear, however, that the cases which have dealt squarely with the instant question have held that the writing must itself amount to a "defamation", and that if (and only if) it is, then if it exposes one to hatred or contempt, etc., it is libelous. In Diener v. Star-Chronicle Pub. Co., 232 Mo. 416, 433, 135 S.W. 6, 11, the court en banc said that "it is argued that the tendency of the publication was to expose plaintiff to 'public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse,' etc. Rev. St. 1899, § 2259 (Ann. St. 1906, p. 1425). But he who thinks that an article merely having that tendency is either a civil or a criminal libel has studied the law of libel to little purpose. The controlling words in that section are 'malicious defamation' by means of printing and writing, etc., tending to provoke him to wrath or expose him, etc. There must be *defamation* in a libelous sense before there can be a libel. * * * To make a libel there must be defamation in the sense of the law, before the public scorn and contempt feature is operative. Defamation includes the idea of calumny, asper-

sion by lying; the injury of another's reputation in that way. To defame is to speak evil of one maliciously, to dishonor, to render infamous." And see: Hylsky v. Globe Democrat Publishing Co., supra, 152 S.W. 2d 122[5, 6]; Orchard v. Globe Printing Co., 240 Mo. 575, 588, 589, 144 S.W. 812, 815.

The Restatement of Torts, Vol. 3, § 559, p. 140, says: "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." However, in Comment b under Section 559 is this: "Communications are often defamatory because they tend to expose another to hatred, ridicule or contempt."

In 53 C.J.S., Libel and Slander, § 13, p. 59, the rule is stated that "In order to be libelous per se, the defamatory words must be of such a nature that the court can presume as matter of law that they will tend to disgrace and degrade the person *or* hold him up to public hatred, contempt, or ridicule or cause him to be shunned and avoided; in other words, they must reflect *on his integrity, his character, and his* [54] *good name and standing* in the community, *and* tend to expose him to public hatred, contempt, or disgrace. * * * It is not sufficient, standing alone, that the language is unpleasant and annoys or irks plaintiff, and subjects him to jests or banter, so as to affect his feelings." (Emphasis ours.)

The importance of all of which in the instant case is this: There can be no doubt that the communications set forth in counts 1 and 3 are capable of a meaning which would expose plaintiff to "ridicule." Certainly that is true if "ridicule" is used in the sense of subjecting plaintiff to jests or banter or injured personal feelings. Consequently, if the statute makes a communication libelous solely because it exposes one to ridicule, then the words alleged in count 1, for example, are capable of a defamatory meaning and count 1 would therefore state a claim for relief. We are of the opinion, however, that it is the law in Missouri that a communication is not defamatory solely because it may expose one to ridicule in the sense, at least, that it exposes him to jests or injured personal feelings. And, however difficult it may be to formulate a definition of "defamatory" which may be applied in determining whether particular words constitute a "defamation", we need go no further in this case than to reach the conclusion that words do not constitute a "defamation" solely because they subject one to ridicule.

As to Count 1. Section 509.210 provides that in a libel or slander action, it is sufficient to aver that the alleged libelous words were spoken of and concerning the plaintiff, and that a statement of extrinsic facts is unnecessary to show the application to plaintiff of the alleged defamatory matter. Even so, however, count 1 pleads no matter which would indicate that the article set forth in count 1,

even though it was spoken of and concerning the plaintiff, conveyed the meaning that the publishers of the article intended thereby to charge that plaintiff was not a proper law enforcement officer because of the noted deficiencies in *his* dress and the mentioned objectionable actions on *his* part. We shall assume, however, for present purposes, that the petition sufficiently alleged that plaintiff was falsely accused of the mentioned deficiencies in dress and of the mentioned objectionable acts. Even so, we are of the opinion that the words used, standing alone, are not capable of a defamatory meaning. As we have heretofore indicated, the words are such that they might well subject plaintiff to jests or banter and affect his personal feelings, but they could not, standing alone and reasonably construed, so affect his reputation or character or his integrity as to tend to provoke him to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse.

As to Count 2. There it is alleged that plaintiff was falsely called "Seymour's infamous ex-marshal." We have no doubt that the false characterization of one in writing as "infamous", standing alone, or in context, is actionable per se. Webster's New International Dictionary, 2d Ed., Unabridged, defines "infamous" as: "1. Of very bad report; having a reputation of the worst kind; held in abhorrence; guilty of something that exposes to infamy; base, detestable; as, an infamous traitor. 2. Causing or producing infamy; deserving detestation; scandalous to the last degree; as, infamous acts, vices. 3. Having a bad name as being associated with something detestable; perilous; noxious. 4. *Law.* Branded with infamy by conviction. *Syn.*—Nefarious, odious, contemptible, shameful, ignominious."

In 43 C.J.S., p. 43, concerning the word "infamous", it is said: "Primarily, without fame or good report; hence in its general or common use, detestable, held in abhorrence, odious; shameful or disgraceful. The term 'infamous' has been said to have a technical import more extensive than mere degradation or reproach.

"It has been held synonymous with 'base' see 9 C.J.S. p 1553 note 15, 'detestable,' 'disgraceful' see 27 C.J.S. p 146 note 66, 'ignominious' see 42 C.J.S. p 378 note 50, [55] 'odious,' 'scandalous,' 'shameful,' and 'vile.'" And concerning the word "infamy": "Loss of character, public disgrace; that state which is produced by the conviction of crime and loss of honor; that state of incompetency implying such a dereliction of moral principle as carries with it a conclusion of a total disregard to the obligation of an oath."

A written communication which contains the false charge that one is an "infamous ex-marshal" is entirely capable of a meaning which would so harm the reputation, character, and integrity of the one so described as to lower him in the estimation of the community, expose him to public hatred, contempt, and ridicule, and deprive him

of the benefits of public confidence and social intercourse. The words, standing alone, are capable of being reasonably construed as meaning that plaintiff was and is an infamous person or that he was an infamous town marshal; either of which meanings carries with it the imputation that plaintiff is or had been guilty of infamous acts by reason of which he had been reduced to a state of infamy.

As to Count 3. The first article set forth in count 3 shows on its face that the writer purportedly reported the idea of some unknown person that because of recent publicity concerning plaintiff "the City Council should put Dave [plaintiff] in a cage and charge admission to tourists" in order to obtain money for city purposes. While these words are capable of a nondefamatory construction, we are of the opinion that we may not say that the words, reasonably construed, are not capable of being understood in such a way as to so harm and injure the reputation and character of plaintiff as to provoke him to public wrath and expose him to public hatred, contempt, and ridicule, and to deprive him of the benefits of public confidence and social intercourse. It is true that the ostensible reason suggested as to why tourists would pay admission to see the plaintiff in a cage was because of his recent publicity. But it is also true that the repetition of the suggestion that a human being be placed in a "cage" for public display may well carry with it the meaning that it would be necessary to cage plaintiff in order to place him on public exhibition. In the usual course of events, one who, because of publicity, good or bad, has become notorious enough to cause people to pay just to look at him, would not need restraint or confinement. The false suggestion of the necessity to cage a human being is capable of reasonably being construed as a false accusation that one is so mentally deficient or otherwise devoid of normal human characteristics as to require restraint. We, therefore, may not say as a matter of law that the words were not defamatory and would not tend to expose plaintiff to public hatred, contempt, or ridicule, and so injure plaintiff's reputation as to deprive him of the benefits of public confidence and social intercourse.

The second article set forth in count 3 suggests that the writer of the first article intended thereby to be funny, and ends with the statement that "It's one thing to have proper law enforcement. It's another thing to have law enforcement that's crude, belligerent, unfair, and at times, ignorant." Clearly, the words, heretofore set forth, which preceded those just quoted are not capable of a defamatory meaning. The last quoted words amount to the allegedly false charge that the methods used by plaintiff to enforce the law in Seymour were crude, belligerent, unfair, and sometimes displayed plaintiff's ignorance of law enforcement. In our view these words are not capable of a meaning which would so harm plaintiff's reputation or reflect upon his character and integrity, as to lower him in the estimation of

the community or deter persons from associating or dealing with him. The words, in final analysis, only convey one person's opinion of plaintiff's methods in the field of law enforcement, which field involves the highly controversial questions of what are proper law enforcement methods and whether a given individual has knowledge of, and practices, the methods which others think proper. The words, reasonably construed, do not reflect on plaintiff's [56] character, good name, or standing in the community.

It follows that the judgment of the trial court is affirmed as to count 1 and reversed as to counts 2 and 3, and the case is remanded.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the Court en Banc. *Leedy, C.J., Dalton, Hollingsworth, Westhues, Eager* and *Storckman,* JJ., concur; *Hyde,* J., concurs as to Counts 1 and 2; dissents as to Count 3 stating a cause of action.