**Edwin A. WALKER, Appellant,**

v.

**The KANSAS CITY STAR COMPANY, a corporation, and Associated Press, Respondents.**

**No. 51705.**

Supreme Court of Missouri, Division No. 1.

July 11, 1966.

Motion for Rehearng and to Transfer to Court En Banc Denied Sept. 12, 1966.

**46**

James W. Jeans, Jeans & Boudoures, St. Louis, Clyde J. Watts, Oklahoma City, Okl., for appellant.

David R. Hardy, Charles L. Bacon, John T. Martin, Robert B. Olsen, Kansas City, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Watson, Ess, Marshall & Enggas, Kansas City of counsel, for respondent.

J. D. James, David R. Odegard, Houts, James, McCanse & Larison, Kansas City, for defendant-respondent Associated Press.

HIGGINS, Commissioner.

Edwin A. Walker sued The Kansas City Star and Associated Press for $500,000 actual and $500,000 punitive damages. The trial court sustained defendants' motions to dismiss.

Plaintiff's petition charged that "defendants caused to be published and did publish" in the October 1, 1962, edition of the Kansas City Star and the October 1 and 2, 1962, editions of the Kansas City Times, the following articles (from the transcript):

"TROOPS INTO RIOTING AT OLE MISS.

NATIONAL GUARDSMEN ARRIVE AT CAMPUS TO QUELL VIOLENCE IN WHICH FRENCH NEWSMAN IS SLAIN.—OUTBREAK OCCURS DESPITE THE PRESIDENT'S PLEA FOR PEACE.

MANY SHOTS FIRED.—OFFICERS BEAT OFF STUDENT CHARGES.—ONE LED BY GENERAL WALKER.—SEVERAL HURT IN WILD DISORDER.

Bulletin.

Washington (AP)—Army Headquarters received word from Mississippi early today that about 200 persons have joined the rioting mob and that the situation on the University of Mississippi campus at Oxford was 'very bad.' Automatic weapons fire was being aimed at the registration building.

(By The Star's Leased Wire Services.) Oxford, Miss.—A reporter was killed and at least nine other persons injured—four by shotgun blasts—in rioting on the University of Mississippi campus last night after James Meredith, Negro, arrived to enroll.

National guardsmen have arrived at the Ole Miss campus to quell the rioting.

Two battalions of military police left Memphis, Tenn. by truck convoy early today for Oxford.

At the same time, the Army announced that 1,100 combat troops from Ft. Benning, Ga., had been ordered to go directly to Oxford.

Dead was Paul Guihard, a correspondent for Agence French Presse and The London Daily Sketch.

He was first reported to have died of a heart attack in the rioting, but later accounts were that his body was found beside a women's dormitory with a gunshot wound in the back.

REPORTER IS SHOT.

Shotgun blasts from the mob wounded three marshals and an Associated Press reporter, Bill Crider. Crider suffered a slight wound in the back. ·

One of the marshals was in serious condition from a shotgun blast which struck him in the neck.

Four other marshals and one student were injured by clubs, stones and broken bottles as the riot continued.

Five highway patrolmen also were reported injured.

Some adults mixed with the students, protesting the admittance of the Negro to the all white university.

Who fired the shots was not known, but the marshals said they had done no shooting. They used tear gas against the mob, but it kept milling around the campus, with no sign of going home.

The rioting erupted after massive federal forces overpowered state resistance and moved Meredith on campus. Students and other youths rioted in waves.

The rampaging mob of white youths charged a line of federal marshals twice, despite Gov. Ross Barnett's indirect admission that he was giving up physical resistance in Mississippi's battle to keep the 29-year-old Negro out of Ole Miss.

The 64-year-old governor, who swore he would go to jail rather than see Meredith in Ole Miss, said in Jackson that Mississippi was 'completely' surrounded' (sic) and 'physically overpowered.'

"The federal marshals blasted back at the rioting youths with tear gas—stopping two charges and breaking up a rampage of vandalism.

## WALKER IS LEADER

Former Maj. Gen. Edwin Walker led one of the charges.

Flying bottles, stones and bricks left scores bleeding and hurt.

A marshal clubbed a white student entering the dormitory where Meredith was housed. Students hooted: 'One Nigger, one dormitory.' Many of the students packed their clothes and left rather than stay in the dormitory with the Negro.

Even as the youths stormed the marshals the first time, President Kennedy addressed himself to the Ole Miss students in a nation-wide broadcast.

'Your honor and the honor of the university are at stake,' the President said.

It wasn't known whether he was aware of the rioting as he spoke.

## USE A BULLDOZER.

The rioting students got themselves mechanized for the third outburst—going after the marshals in front of the administration building with a bulldozer.

Albert Taylor, A. U. S. marshal from Chula Vista, Calif., told how the bulldozer attack was repelled.

He said he and other marshals first saw the machine when it was about 300 feet from the administration building.

## CLING TO VEHICLE.

'There must have been a mob behind it,' Taylor said. 'We gassed them but two or three held on and kept driving. We got a canister right in the seat with them, but one still held on. But we got him and he's under arrest.'

A fire truck trailed the bulldozer. When the truck stalled, after circling the building several times, marshals pulled four persons from the vehicle and—according to one report—began roughing up the four.

"As the rioting increased, the President and his brother, Robert F. Kennedy, attorney general, kept a vigil at the White House, receiving direct telephone reports from official sources in Oxford.

The second wave of rioting, led by General Walker, took the form of a direct charge on the marshals holding guard posts shoulder to shoulder outside the administration building.

## IN ARKANSAS CASE.

Walker, an outspoken advocate of Mississippi resistance to federal court desegregation orders, commanded the 101st air-

borne in the Little Rock desegregation in 1957. Now retired, he says he was 'on the wrong side' then.

The students rushed the marshals with bricks and soft drink bottles flying. Some of them wore gas masks. But the marshals turned them back with their gas launchers.

The first outburst of violence, instead of taking the form of a charge, appeared more like sporadic outbursts of vandalism.

— — — — — — —

The mob of students—most of them returning only yesterday from an off-campus football game—grew steadily as the word spread in late afternoon that marshals had ringed the administration building.

By early last night—when Meredith arrived, the President spoke, and the governor issued his statement—an estimated 2,500 students were standing around, some jeering, some joking, some just watching. Then they got rowdy.

CAMERA IS BROKEN.

They jumped a news photographer and smashed his camera. They threw stones and soft drink bottles and flipped lighted cigarettes—all in the direction of the marshals.

They attacked a car with out-of-state license plates, smashed the windows and sent a man and women fleeing.

"Then they turned on one of the army trucks standing by—part of the marshals' convoy—and took a cap off the auxiliary gasoline tank and threw a piece of flaming newspaper at the rising fumes. Their attempt to set the truck afire didn't work, but it triggered the marshals to action.

The officers donned gas masks and started firing tear gas pellets—first at the students they thought were the leaders, then at everybody in sight.

Tear gas fogged up much of the campus, sending students running away with handkerchiefs over their faces. And the rowdy students scattered."

(The following appears under large photograph of General Walker, and others:)

"CHARGES OF INCITING A REBELLION today resulted in the arrest of Edwin A. Walker, retired army general. Here he gestures as he walks on the campus at the University of Mississippi under guard of United States marshals. As he gestured, Walker remarked: 'I guess I am in custody.'—(Wire Photo)"

(The following appears under another photograph, of a uniformed group of Army personnel, on the same page:)

"ON THE OTHER SIDE AT LITTLE ROCK.—This photogrph (sic) was made in 1957 when Maj. Gen. Edwin A. Walker commanded troops in the school integration crisis at Little Rock. Seated at the left, he joined troops in a prayer meeting at their bivouac as this photograph was taken.—(Wire Photo)"

"NEGRO ENROLLS: WALKER ARRESTED. U. S. MARSHALS ESCORT JAMES MEREDITH ACROSS LITTERED CAMPUS AND PASS CONFEDERATE FLAGS AT HALF MAST TO LYCEUM TO REGISTER FOR CLASSES. 4,600 TROOPS ON DUTY.

COMMANDING GENERAL SAYS 'THE AREA IS SECURE' AFTER 11 HOURS OF RIOTING—EPITHETS AT THE NEW STUDENT.

CHARGED IN REBELLION.

FORMER GENERAL, WHO LED TROOPS AT LITTLE ROCK IN 1957, FACES A SERIES OF U. S. CHARGES IN OXFORD, MISS. DISTURBANCE. LED AN ATTACK. HE ALSO WAS ON THE SCENE IN

THE TOWN TODAY SHORTLY BE-
FORE NEW OUTBREAK.

(By the Star's Leased Wire Services.)

Edwin A. Walker, former major general, was arrested today at Oxford, Mississippi, and charged with inciting an insurrection, Robert F. Kennedy, attorney general, announced in Washington.

Walker, who commanded the troops ordered by former President Eisenhower into Little Rock in the 1957 integration crisis there, appeared as the leader of rioters on the Ole Miss campus last night. He was quoted as telling students, 'If you can't win, go home. Don't stay at the university. But let's not quit. We can win.'

The attorney general announced these charges had been filed against the former general:

Conspiracy to incite a rebellion or insurrection.

Conspiracy to hinder federal officers in the performance of their duties.

Assaulting a federal officer.

Justice department officials said the conspiracy to incide (sic) rebellion charges carries a maximum penalty of 20 years in prison and a fine of $20,000.

Execution of such a conspiracy, as distinguished from the act of conspiring, involves a maximum penalty of 10 years and a fine of $10,000, they said.

The penalty for conspiring to hinder a federal officer would be up to five years in prison and $6,000, and for assaulting a federal officer, three years and $5,000.

The Justice department said Walker was arrested about noon today (Kansas City time) on the outskirts of Oxford and that arraignment on the charges would occur as soon as possible before Omar Craig, U. S. Commissioner.

Walker had appeared on the street near the courthouse square a short time before he was arrested and shortly before a mob fired shots which drew a quick charge by federalized Mississippi guardsmen."

"Walker wore a dark blue suit and a 10-gallon hat. He spoke quietly to some of those in the crowd nearest the troops and then backed off as military eyes watched him closely.

Reports from the campus last night told of Walker taking over command of the rioters after most of the students at Ole Miss withdrew, and leading one charge. The Chicago Daily News Service said he directed use of a campus fire truck in an advance against federal marshals. After that failed, rioters used a bulldozer in an unsuccessful effort to break through the federal lines on the campus.

OVER TO BARNETT.

Walker last week offered his services to Governor Ross Barnett, claiming he was on the wrong side in the 1957 crisis in Arkansas and this time wanted to be on the right side.

He called for 10,000 volunteers from every state to converge on Oxford. Later he toned that down.

His actions at Oxford caused him to be described today in the U. S. Senate as possibly a 'sick man who ought to be committed.'

Sen. Wayne Morse (D.-Ore.) told the Senate that if Walker led students in rioting against federal authority he should be charged with 'inciting an insurrection.'

CONDUCT REPREHENSIBLE.

'As an ex-Army officer.' Morse said, 'Walker's conduct is all the more reprehensible.'

'Maybe he is a sick man. If he is, he hought (sic) to be committed—he ought not to be at large.'

Sen. Stephen Young (D.O.) told the Senate this is a time for cool heads, and

not for 'the rantings of violent segregationists or psychopaths such as ex-Gen. Edwin A. Walker.'

Young said if Walker made the statements attributed to him, 'I am glad he is an ex–general and a private citizen instead of in command of any youth in this county (sic).'

'I hold him in utmost contempt for his appearance on the campus of this great university, "Ole Miss," and for attempting to lead a charge of some 1,000 unruly rioters against United States Marshals,' said Young."

"AN EARLIER UPROAR.

Walker left the army after an uproar over the indoctrination of troops under his command in Germany. At the time, it was charged he was using John Birch society material in the indoctrination effort.

Relman Morin, Associated Press correspondent who covered the Little Rock crisis and who now is in Oxford, today compared the Walker of 1957 and 1962.

'After the Little Rock riots, Walker said that he found his duty there distasteful,' Morin wrote from Oxford. 'However, at the time, he was the crisp and professional soldier who gave no sign of his feeling. He set up his command post at the corner of Central High school, center of the riots.

"The contrast is most marked by the size of the operations here. In Little Rock it was largely quiet if you were three or four blocks from the school.

In Oxford today, there is little quiet anywhere. On the contrary, there is a brooding sense of disaster.

Little Rock was a Skirmish. Oxford is a war.

The riots just five years ago in Little Rock were ugly and dangerous. In Oxford, the ugliness and danger is magnified on a gigantic scale."

LEADER OF CHARGE.

The controversial Texan led a charge of students against U. S. Marshals at the University of Mississippi Sunday night."

The petition also charged that "the aforesaid published matter was libelous in that it tended to expose plaintiff to hatred, contempt and ridicule and to deprive the plaintiff of the benefit of public confidence and social associations"; that it "was read by employees of the news gathering services and The Kansas City Star Company and the general public"; that it "was caused to be published and was published by the defendants in bad faith and defendants' conduct was willful, wanton and malicious"; and that "plaintiff suffered actual damages by reason of the aforesaid published matter."

The motions to dismiss claimed that the petition failed to state a cause of action alleging: (1) the articles do not constitute libel per se and the petition does not state a claim for libel per quod; (2) the articles are not alleged to be false or defamatory; and (3) the articles are privileged communications "both constitutionally and otherwise."

■ In respect to the first ground of dismissal, appellant tacitly concedes that he has not stated a claim for libel per quod and limits his contention to supporting his petition as a claim for libel per se, a position well taken. Publication of a statement imputing or charging one with commission of a crime, whether directly or indirectly, is libelous and defamatory per se. Childers v. Nesselroad, 357 Mo. 1218, 212 S.W.2d 727, 729 [4]; Starnes v. St. Joseph Ry., Light, Heat & Power Co., 331 Mo. 44, 52 S.W.2d 852, 854 [3]; Lightfoot v. Jennings, 363 Mo. 878, 254 S.W.2d 596, 599–600 [8–10]; Riss v. Anderson, 8 Cir., 304 F.2d 188; McKim v. Moore, 291 Mo. 697, 237 S.W. 773, 774 [1]; Bundy v. Hart, 46

Mo. 460. In applying this rule and in considering whether a publication is libelous per se, words to be considered actionable should be unequivocally so, Walsh v. Pulitzer Pub. Co., 250 Mo. 142, 157 S.W. 326, 328 [1], and should be construed in their most innocent sense, Atterbury v. Brink's Express Co., Mo.App., 90 S.W.2d 807, 809 [5]. The Associated Press cautions also that language alleged to be libelous is not actionable per se unless it charges or necessarily imputes commission of a crime, Stowers v. Western Bentley Mercantile Co., Mo.App., 140 S.W.2d 714, 715 [3], holding "he is a dirty crook and a deadbeat" not to be actionable per se. A. P. also cites other examples holding alleged libelous language not to be actionable per se: Diener v. Star-Chronicle Pub. Co., 232 Mo. 416, 135 S.W. 6, 9, "(Plaintiff had) wantonly taken the life of an innocent child in direct violation of law"; Krup v. Corley, 95 Mo.App. 640, 69 S.W. 609, 612, "(Plaintiff) forged my name to one of his rent receipts"; Bundy v. Hart, supra, 46 Mo. l. c. 461, "He had to leave Indiana for burning a barn"; McManus v. Jackson, 28 Mo. 56, 57, "He swore a lie"; Birch v. Benton, 26 Mo. 153, 155, "I wonder when the damned scoundrel whipped his wife last? * * * he knocked out three of her teeth"; Palmer v. Hunter, 8 Mo. 512, "(Plaintiff) swore a point blank lie to clear William Sally of stealing honey"; Church v. Bridgman, 6 Mo. 190, "(Plaintiff) was in the habit of handling and passing counterfeit money"; Dyer v. Morris, 4 Mo. 214, 215, "(She) has gone down the river with two whores * * * to the goose-horn at St. Louis." These examples are either distinguishable from the language of the articles under consideration by the language itself or, as noted in McKim v. Moore, supra, 237 S.W. l. c. 774, were earlier decisions "where it is evident men were freer in the use of the vernacular and less mindful of the character and effect of their remarks." Certainly those instances are in contrast to the holding in 1953 that "you are not going to talk here you damned communist," was actionable

per se. Lightfoot v. Jennings, supra, 254 S.W.2d l. c. 599 [6].

■ Against this background it is apparent from the articles that crimes were imputed to plaintiff. They state that the National Guard, United States marshals, military police and army combat troops were sent to Oxford, Mississippi, to quell a rioting mob formed there despite President Kennedy's plea for peace. The mob was said to have formed in protest to the enrollment of James Meredith in the University of Mississippi and that many shots were fired killing a newsman and wounding three marshals and an Associated Press reporter; four other marshals and five highway patrolmen were reported injured by clubs, stones, and broken bottles. Tear gas was reported used against the mob as the federal marshals stopped two charges made against them. Plaintiff, identified by defendants as "former Maj. Gen. Edwin Walker," was said to have "led one of the charges," and a headline proclaimed, "Walker is leader." This was amplified by defendants saying, "The second wave of rioting, led by General Walker, took the form of a direct charge on the marshals holding guard posts shoulder to shoulder outside the administration building." It was also stated that "Walker * * * appeared as the leader of rioters on the Ole Miss campus * * *. He was quoted as telling students, 'If you can't win, go home. Don't stay at the university, But let's not quit. We can win.' * * * Reports * * * told of Walker taking over command of the rioters after most of the students * * * withdrew, and leading one charge." He was said to have "called for 10,000 volunteers from every state to converge on Oxford." An Associated Press reporter reported in the articles that as compared to Little Rock, "in Oxford, the ugliness and danger is magnified on a gigantic scale." The articles themselves indicate that the actions imputed to General Walker would, if true and proved, constitute crimes in that it was report-

ed also that Attorney General Kennedy announced the filing of charges against General Walker of "Conspiracy to incite a rebellion or insurrection, conspiracy to hinder federal officers in the performance of their duties," and "assaulting a federal officer." These matters are crimes under federal law, 18 U.S.C.A. § 2384, 18 U.S.C.A. § 372, 18 U.S.C.A. § 111, and it has been held in another jurisdiction that a similar report of Walker's actions at Oxford was libelous per se because statements that he was in command of charges by rioting students imputed to him the crime of insurrection against the United States. Associated Press v. Walker, Tex. Civ.App., 393 S.W.2d 671, 680 [8], 681 [9], affirming judgment for General Walker for $500,000 damages. In addition, the death of the newsman and the injuries to the officers during the course of the riots could have exposed the rioters to charges of murder and assault, and General Walker was said to have been not only a participant in, but also to have been in command of the charges and rioting.

The Associated Press argues that the petition fails to charge defendants with imputing crimes of seditious conspiracy, conspiracy to hinder federal officers, and of assaulting federal officers because "an essential element of those crimes is that the Federal officers must have been at the time engaged in lawful discharge of * * * their office, and nowhere * * * does this fact appear. This essential ingredient cannot be simply presumed." This argument is refuted by the report of charges said to have been filed by the attorney general, i. e., "conspiracy to hinder federal officers *in the performance of their duties*," and common knowledge would tell the reader that the National Guard, United States marshals, military police, and army combat troops were not present in Oxford, Mississippi, by accident or coincidence, but rather were "ordered to go directly to Oxford," as reported in connection with the army combat troops from Ft. Benning, Georgia.

The second ground for dismissal was that the publications complained of are not alleged to be false or defamatory.

It has been said that "[t]he essential facts [of libel] are the falsity of the charge, and its publication and libelous nature," McDonald v. R. L. Polk & Co., 346 Mo. 615, 142 S.W.2d 635, 638 [1]. See also Holliday v. Great Atlantic & Pacific Tea Co., 8 Cir., 256 F.2d 297, 302 [9], and Fritschle v. Kettle River Co., 346 Mo. 196, 139 S.W.2d 948, 950 [4], in which suits were dismissed for failure to set out any words claimed to have been used to defame *and* for failure to allege that the statement made was false. Many of the cases show that plaintiffs in libel suits follow the general rule and usually aver that the complained-of statements were false. Such an allegation is not necessary, however, to all cases of libel because the requirement varies with the nature of the case. In some cases, such as Fritschle v. Kettle River Co., supra, dealing with whether plaintiff owed a certain sum of money as stated by defendant, there is no cause of action unless the statement is alleged to be false. On the other hand, there are cases in which falsity need not be alleged, e. g., where the words are alleged to be a libel; where the words are actionable per se; and where the publication charges an indictable offense. 53 C.J.S. Libel and Slander § 167, pp. 263, 264. All of those situations apply here because the petition alleges the publication to be libelous per se and it has been demonstrated previously that the publication imputes criminal offenses to plaintiff. This is consistent with the requirements for submission of a libel suit because if this case had gone to trial the jury would have been instructed to find for plaintiff if it believed that defendants published the statement complained of, that the statement defamed and damaged plaintiff, and that it was read by the public. MAI 23.06. The issue of truth in a defamation suit is an affirmative defense to be pleaded by defendants, § 509.-090 V.A.M.S., and the risk of nonpersuasion on the issue must be assumed by them.

MAI 28.09. These provisions are, of course, supported by the cases. In Cook v. Globe Printing Co., 227 Mo. 471, 127 S.W. 332, 349, the words complained of were, as in the present case, libelous per se and, even though their publication was alleged to have been false, it was stated by the court: "The falsity of all defamatory words is presumed in the plaintiff's favor, and he need give no evidence to show them false. The burden is on defendant to rebut this presumption by giving evidence in support of the plea of justification. Newell on Libel and Slander (2d Ed.) p. 651; Odgers on Libel and Slander, 170. * * * In this record there is no plea of the truth of the charge, and there was no admission of the truth thereof in the testimony of plaintiff, so that this contention of defendant affords no reason for sustaining the demurrer to the evidence." See also Rail v. National Newspaper Ass'n, 198 Mo.App. 463, 192 S.W. 129, 135 [10]. Equally significant is the holding in Sotham v. Drovers Telegram Co., 239 Mo. 606, 144 S.W. 428, 432 [12]: "Instruction numbered 1 defines libel in accordance with the statute and the decisions of this court. The error complained of is that the instruction ignored the issue of the truth of the publication as made by the answer; also that the instruction was given on the theory that the article was libelous per se. The latter complaint need not be considered. This instruction sets forth the alleged libel and is followed by the statutory definition of libel. The court then directs the jury that, if they believe and find from the evidence that the article published falls within the definition previously given, then the article is libelous under the statute. In thus instructing the jury the court was following not only the law as approved by this court but the general law upon the subject. Julian v. Kansas City Star Co., 209 Mo. 35, 107 S.W. 496; McCloskey v. [Pulitzer] Publishing Co., 152 Mo. 339, 53 S.W. 1087; Odgers on Libel and Slander (4th Ed.) 105. In Odgers, supra, the rule is laid down that: 'The proper course is for the judge to define what a libel is in point of law and leave it to the jury whether the publication in question falls within that definition.'

"The statutory definition of libel does not make the falsity of the publication a part of the definition. The Constitution and statute provide that the truth of the libel may be given in evidence, but it may thus be given only when pleaded as an affirmative defense. Its falsity is presumed and need not be proved as a part of plaintiff's case."

Thus, under these authorities, even though containing allegations of falsity, it is obvious that plaintiff need not plead falsity in a case of libel per se where he is not required to prove falsity.

Respondents cite Fowler v. Donnelly, 225 Or. 287, 358 P.2d 485, 85 A.L.R.2d 452, on the proposition that an averment of falsity is necessary to state a cause of action in libel which that court so held relying upon, among other authorities, Fritschle v. Kettle River Co., supra. This applies "[i]n the absence of special circumstances," Fowler v. Donnelly, supra, 1. c. 487 [3], and the obvious distinction from the present case is that the words alleged to be libelous and defamatory in those cases were not the "special circumstances" of libel per se nor of an imputation of crime, and therefore needed an averment of falsity in order to state a cause of action for their publication. Both cases, together with Holliday v. Great Atlantic & Pacific Tea Co., supra, appear in the Annotation: Necessity and sufficiency of plaintiff's allegations as to falsity in defamation action, 85 A.L.R.2d 460, and the distinction made here is stated in section 3: "The rule has been enunciated * * * that there is no necessity of an allegation of falsity in respect to written or printed matter that is libelous per se * * * since in cases of libel or slander per se the law raises a presumption of untruth." See also 33 Am.Jur., Libel and Slander, § 242, p. 222. The distinction applies also to Bottomly v. Bottomly, 80 Md. 159, 30 A. 706, Weekes v. Westchester Newspapers, Inc., Sup., 115 N.Y.S.2d 418,

Rose v. Borenstein, City Ct., 119 N.Y.S.2d 288, McGraw v. Thomason, 265 Ala. 635, ·93 So.2d 741, Harper v. Huston, 120 Kan. 194, 243 P. 305, Snavely v. Booth, 6 W. W. Harr., 36 Del. 378, 176 A. 649, Old Dearborn Dist. Co. v. Seagram Distillers Corp., 288 Ill.App. 79, 5 N.E.2d 610, Thomson v. Kansas City Star Co., Mo., 387 S.W. 2d 493, Rice v. Albee, 164 Mass. 88, 41 N.E. 122, cited by respondents, because they did not deal with words which were libelous per se or imputed crime to the plaintiff. It is interesting to note also that the Oregon case recognizes that truth as a defense must be alleged by defendant and the burden of establishing it borne by him.

■ Respondent Associated Press says also that plaintiff's petition fails to advise defendants of the charges with which they are confronted, especially as to which parts of the article are true. Johnson v. Flex-O-Lite Mfg. Corp., Mo., 314 S.W.2d 75, 79 [3]. The charge, of course, is that defendants have libeled plaintiff by a publication charged to be libelous, and "[t]he office of pleadings is to present, define and isolate the controverted issues so as to advise the trial court and the parties of the issues to be tried and to expedite the trial of a cause on the merits," Johnson v. Flex-O-Lite Mfg. Corp., supra. Certainly defendants indicate they are advised as to the charges when they file motions to dismiss plaintiff's petition stating that the complained-of publication does not constitute libel per se or per quod, that it contains no allegation of falsity or defamation, and that it is privileged. If A. P. is arguing that no issue of truth is presented by plaintiff, the argument is without merit because, as previously demonstrated, truth is an affirmative defense, and the defendants should be in position to know if their article is true in all its parts in order to take advantage of the defense of truth which they may raise. Rule 55.22 V.A.M.R.

The second part of the second ground of dismissal is that the petition is defective for failure to allege that the publication complained of was defamatory. Respondents say that defamation is an essential element to be pleaded by plaintiff.

■ Section 559.410 V.A.M.S. defines libel as "the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse * * *." It has already been stated and held in connection with the first ground of dismissal that defendants' publication was libelous *and* defamatory per se because it imputed commission of crimes to plaintiff. See particularly Starnes v. St. Joseph Ry., Light, Heat & Power Co., supra, and Lightfoot v. Jennings, supra, and, if any further reference to defamation be needed, it is found in plaintiff's use of the statutory language in his allegation "that the (article) was libelous in that it tended to expose plaintiff to hatred, contempt and ridicule and to deprive (him) of the benefit of public confidence and social associations." Certainly this allegation is sufficient to advise defendants that plaintiff claims to have been defamed by their publication. Johnson v. Flex-O-Lite Mfg. Corp., supra. When defendants' article imputes crime to plaintiff, as it has been held to do here, the court can presume the element of defamation and that the words will tend to degrade and disgrace the plaintiff, 53 C.J.S. Libel and Slander § 13, p. 59, Coots v. Payton, 365 Mo. 180, 280 S.W.2d 47, 53 [4], and the petition thus meets the requirement of Diener v. Star-Chronicle Pub. Co., supra, 135 S.W. l. c. 11, that "there must be defamation in a libelous sense before there can be a libel."

■ In respect to the third ground of the motion to dismiss, that the publications complained of were privileged, there is authority which states, "While at common law defendant in a libel suit might make his defense of privilege under the general issue, it was not available on demurrer,"

Cook v. Globe Printing Co., supra, 127 S.W. l. c. 349, and this because qualified privilege is also an affirmative defense with the burden of convincing the court of its applicability resting on the defendant. MAI 28.08; Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S.W. 100, 107 [7], 26 L.R.A.,N.S., 1080; Warren v. Pulitzer Pub. Co., 336 Mo. 184, 78 S.W. 2d 404, 415 [12]. If the defendant pleads the defense of qualified privilege and meets the burden of convincing the court of its applicability, "[t]he plaintiff may overcome the privilege pleaded either by proof that the publication was inspired by actual malice, or that the facts published and commented upon were false;" resolution of that issue is for the jury, Warren v. Pulitzer Pub. Co., supra, l. c. 415 [13], Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d 341, 345 [10], and General Walker has entitled himself to offer proof on malice in the event the trial court would find qualified privilege applicable by alleging that the articles complained of were "published in bad faith and defendants' conduct was willful, wanton and malicious."

 Two situations have been noted in which a trial court could dismiss a libel petition on the ground of privilege: One, "unless plaintiff's petition showed on its face that the occasions for the communications were absolutely privileged," and two, "unless plaintiff's petition affirmatively averred that the occasions for the communications were not abused * * *, we could not, on the ground urged, hold that plaintiff had failed to state claims upon which relief could be granted." Coots v. Payton, supra, 280 S.W.2d l. c. 52 [7]. However, as previously demonstrated, a plaintiff whose petition gave rise to the applicability of the defense of qualified privilege would still be in court if he alleged further, as plaintiff does here, that the publication was inspired by actual malice and made in bad faith. Thus, even if it be assumed that plaintiff's actions and status while at Oxford, Mississippi, make his libel suit based on reports of the situa-

tion there of the type of one "brought by a public official against critics of his official conduct," N. Y. Times Co. v. Sullivan, 376 U.S. 254, 264, 84 S.Ct. 710, 717, 11 L.Ed.2d 686, Garrison v. State of Louisiana, 379 U.S. 64, 76, 85 S.Ct. 209, 13 L.Ed.2d 125; or one involving "matters of public concern, public men, and candidates for office," Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 282, 20 L.R.A.,N.S., 361; or by a former county official in respect to his conduct when in an official capacity, Rosenblatt v. Baer, 1966, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597; or by an officer of a labor union, Linn v. United Plant Guard Workers of America, 1966, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582; or by a police detective, Pape v. Time, Inc., 7 Cir., 354 F.2d 558; or by a noted biochemist when speaking on a political cause, Pauling v. News Syndicate Co., 2 Cir., 335 F.2d 659, 662, Pauling v. National Review, Inc., Sup., 269 N.Y.S.2d 11; or by a member of a public official's law firm, Gilberg v. Gaffi, 21 A.D.2d 517, 251 N.Y.S.2d 823; or by a political news commentator, Pearson v. Fairbanks Pub. Co., Alaska, 413 P.2d 711; or by one who projected himself "into the arena of public controversy and into the very 'vortex of the discussion of a question of pressing public concern,'" Pauling v. Globe Democrat Pub. Co., 8 Cir., 1966, 362 F.2d 188; Walker v. Courier-Journal and Louisville Times Co., D.C.Ky., 246 F. Supp. 231, 233 [2]; or by a judge in respect to his qualifications, Salinger v. Cowles, 195 Iowa 873, 191 N.W. 167, 173–174 [11]; or by a "leader" in political matters, Peck v. Coos Bay Times Pub. Co., 122 Or. 408, 259 P. 307, 311 [13, 14]; or by a lawyer in connection with an arrest report, Langworthy v. Pulitzer Pub. Co., Mo., 368 S.W.2d 385, 390 [12]; and although A. P. says that "plaintiff has pleaded no facts sufficient to remove (the publications) from their privileged status," and the Star says that "plaintiff does not allege the degree of malice said to be necessary by Times," it is quite obvious that plaintiff's charge that the complained-of matter was "published by

the defendants in bad faith and defendants' conduct was willful, wanton and malicious" is sufficient to conform his pleading to the rule of New York Times Co. v. Sullivan, supra, 376 U.S. 1. c. 279, 84 S.Ct. 1. c. 726, "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Certainly, plaintiff's pleading is "simple, concise and direct" as required by Section 509.040, V.A.M.S., in leveling a charge of wanton and willful malice at defendants, and until plaintiff is permitted a trial on the merits where he can offer whatever evidence he may have to support his charge it cannot be said that he has failed to make a case of actual malice. Despite respondents' urgings, this court is not prepared to indulge, as did the district judge in Walker v. Courier-Journal and Louisville Times Co., supra, 246 F. Supp. 1. c. 235 [8], in an inference from "the geographical scope and number of Plaintiff's suits and the virtual universality of the publication of the stories complained of," that "[t]hese facts clearly negative the possible attribution of 'actual malice' to any single publisher." Respondents say also that Diener v. Star-Chronicle, supra, and Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S.W. 1143, 33 L.R.A., N.S., 216, are authority for dismissing General Walker's petition. However, they simply held on their facts that the publication complained of was not libelous per se but was "fair and with an honest purpose." More interesting is a statement of the rule now attributed to New York Times Co. v. Sullivan, supra, that "[e]very one has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose, however severe in their terms, unless they are written intemperately and maliciously." Diener v. Star-Chronicle Pub. Co., supra, 132 S.W. 1. c. 1149. Plaintiff brings himself within this statement also with his charge of wanton and willful malice. Nor does Clark v. McBaine, 299 Mo. 77, 252 S.W. 428, aid respondents because there the complainant sought reinstatement of his professorship at Missouri University, a matter of public interest in which plaintiff himself initiated a discussion in the press on his qualifications in order to show himself worthy of reinstatement. He could not thereafter complain of the exercise of the privilege of counterdiscussion of his qualifications.

So it is as against a mere motion to dismiss, that plaintiff's petition states a cause of action, and the judgment of dismissal is reversed and the cause remanded.

Houser, C., concurs.

Welborn, C., not sitting.

## PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.